**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,**

v.

**PAN AMERICAN WORLD AIRWAYS, INC., et al., Defendants.**

**And Related Cross and Third Party Actions.**

**No. C–81–3636 RFP.**

United States District Court, N.D. California.

Oct. 22, 1985.

---

Fritz Wollett, David T. Kelley, Oscar Williams, E.E.O.C., San Francisco, Cal., for plaintiff.

Scott A. Fink, Robert S. Venning, Heller, Ehrman, White & McAuliffe, San Francisco, Cal., for defendants.

Jay Levy-Warren, Cohen, Weiss & Simon, New York City, for Air Line Pilots Ass'n, International.

Lloyd B. Egenes, O'Gara, Friedman, Egenes & Burke, San Francisco, Cal., Asher W. Schwartz, O'Donnell & Schwartz, New York City, For FEIA.

Richard F. Watt, Cotton, Watt, Jones & King, Chicago, Ill., Kenneth N. Silbert, Beeson, Tayer & Silbert, San Francisco, Cal., Denis F. Gordon, Gordon & Barnett, Washington, D.C., for Caudle & Wynne and NAL Chapter FEIC.

James C. Sturdevant, Sanford Jay Rosen, San Francisco, Cal., for Russell & Baer et al.

Robert H. Wiggins, Wiggins & Wiggins, Miami, Fla., R. Michael Pipkin, Chapel Hill, N.C., Jay White, Redwood City, Cal., for Rankin, et al.

## MEMORANDUM AND ORDER

PECKHAM, Chief Judge.

### INTRODUCTION

On September 13, 1985, this court held a fairness hearing to consider objections to a proposed Consent Decree entered into between Pan Am and the EEOC. The Decree is designed to settle an action under the Age Discrimination in Employment Act of 1967 ("ADEA" or "Act"), 29 U.S.C. § 626 et seq., brought by the EEOC against Pan

Am. Pan Am and the EEOC (referred to jointly as "applicants") argue that the proposed Consent Decree fairly reflects the risks of litigation that the parties face.

Several parties have filed objections to the consent Decree. Forty-five of the eighty-one former Pan Am pilots on whose behalf the EEOC brought this action object to the Decree as providing them with inadequate monetary relief. Most of the objectors (referred to collectively as "claimants") have filed declarations with the court. In addition, those Pan Am pilots and flight engineers who were employed by National Airlines before National and Pan Am merged in 1980 also object to the Decree. These engineers and pilots, in separate filings, argue that the Decree violates their rights as decided by an arbitrator after the merger. Finally, intervenor Rankin contends that the Decree violates the provisions of the Employee Retirement Income Security Act (ERISA).

## FACTS

The following facts appear in the applicant's Joint Application for Entry of Consent Decree:

Pan Am's aircraft, with the exception of the Boeing 737, have a three person cockpit crew. The captain, or first seat, is in overall command of the aircraft. The first officer, also known as the second seat or copilot, is second in command and assumes the captain's responsibilities in case of his disablement. The flight engineer, or third seat, sits at his own instrument panel and primarily monitors the aircraft's operating systems. During normal operation, the engineer does not handle the flight controls. The Air Line Pilots Association (ALPA) represents the pilots, while the Flight Engineers International Association (FEIA) represents the flight engineers.

In 1962 and 1963, Pan Am and the ALPA and FEIA entered into "Crew Complement Agreements" in response to the recommendation of a Presidential Commission that all cockpit crew members be qualified as pilots. These agreements transformed the position of flight engineer into the entry level position for employment as a first officer or captain. Under these agreements, all newly hired flight engineers, called pilot/flight engineers, must possess pilot qualifications. Pilot/flight engineers were placed on the Pilot System Seniority List, entitling them to bid for first officer and pilot positions.

The agreements also protected employees then serving as flight engineers. Those employees, known as "Appendix A" or professional flight engineers, were given prior rights to all Pan Am engineer positions, as long as they obtained the necessary pilot qualifications. The agreements provided, however, that Appendix A flight engineers, unlike pilot/flight engineers, could not bid for pilot positions.

Pilots may also bid, or "downbid", for engineer positions. For example, pilots may bid for engineer vacancies that result from an overall increase in Pan Am's demand for engineers. In addition, pilots may displace, or "bump", engineers in lieu of furlough. In no instance, however, may a pilot displace an Appendix A engineer.

According to the applicants, these are the only circumstances under which the collective bargaining agreements permit a pilot to displace a flight engineer. Applicants admit that Pan Am, pursuant to an agreement with the ALPA and FEIA, permitted one pilot that lost his first-class medical certificate, required for all pilots by the Federal Aviation Administration (FAA), to continue to fly as a flight engineer after he obtained the second-class certificate required for flight engineers.

### Treatment of Age 60 Airmen at Pan Am

Under the FAA's "Age 60 Rule", 14 C.F.R. § 121.383(c), pilots (including first officers) may not serve past the age of 60. This rule does not apply to flight engineers. Pan Am's pension plan, before 1978, provided for the retirement of both pilots and engineers at age 60.

In 1978, Congress amended the ADEA to provide that an employer could not retire its employees at a specified age based solely on a seniority system or pension plan. See 29 U.S.C. § 623(f)(2). In response to the amendments, and after a review of its policies, Pan Am permitted its Appendix A flight engineers to fly past the age of 60. More than 70 Appendix A flight engineers have taken advantage of this new policy. Pan Am did not, however, change its treatment of pilots approaching age 60.

From the effective date of the ADEA amendments, April 6, 1978, until September 28, 1979, there were no flight engineer

vacancies for which pilots were eligible to bid. Twenty-eight of the eighty-one claimants turned 60 before the award of the first engineer vacancy. Pan Am, with no opposition from the ALPA, interpreted its collective bargaining agreement to provide for the retirement of these 28 claimants with loss of seniority. Only one claimant, Raymond Russell, filed a grievance concerning this action. The Pan Am-ALPA System Board of Adjustment unanimously upheld Pan AM's interpretation of the collective bargaining agreement. Pan Am and the ALPA later explicitly provided for retirement with loss of seniority at age 60. Pan Am and the EEOC disagree as to whether this provision changed the contract or codified existing practices.

Pan Am bulletined 10 flight engineer vacancies for which pilots were eligible to bid on September 28, 1979. Four pilots, two of whom are claimants here, bid for these positions. To Pan Am's knowledge, no captain had ever before bid for a flight engineer position. (Applicants do not state whether first officers had ever bid for a flight engineer position.) After awarding positions to the pilots, Pan Am notified them that they would be retired at age 60 despite their job change.

Later in the Fall of 1979, Pan Am awarded engineer positions to three more pilots, two of whom are claimants here. The third pilot, Otto Kiehl, is not a claimant in this action. His separate lawsuit against Pan Am, *Kiehl v. Pan American World Airways, Inc.*, C-81-4274 (WAI), was consolidated with this case, but later settled separately. Pilot Joseph Hazelwood, who successfully bid for an engineer position bulletined in January, 1981, and was retired at age 60, joined in Kiehl's action. In January 1983, Pan Am agreed to reinstate both Kiehl and Hazelwood as flight engineers, provided they passed the required training. Both have served as flight engineers and may continue to do so until they reach the age of 70.

Applicants claim that they have located the bid forms of a total of 7 of the claimants, including those mentioned above.

Applicants state that two other claimants maintain that they submitted bids. Therefore, according to applicants, only 9 claimants bid for engineer positions. Declarations submitted by the objecting claimants state that many other former pilots were deterred from applying because of Pan Am's well-known policy regarding the ability of 60 year old pilots to downbid.

On February 25, 1983, Pan Am changed its policy towards pilots approaching the age of 60. From that point forward, a pilot approaching 60 who was awarded a flight engineer vacancy and completed his training before the first of the month following his sixtieth birthday could remain as a flight engineer until the age of seventy. Pan Am has continued to retire pilots not meeting these criteria. According to the applicants, "a number of" pilots approaching the age of 60 have served as flight engineers.

### The National-Pan Am Merger

The merger of National Airlines and Pan Am in January, 1980, complicates this matter. National Airlines, unlike Pan Am, did not permit pilots or engineers to bid for each other's positions. National kept these two job classifications entirely separate.

The two airlines submitted their dispute regarding the manner in which their seniority lists would be merged to arbitration. On March 12, 1981, Arbitrator Lewis Gill issued his resolution of this dispute. He held that former National airmen would continue not to have bidding rights for engineer positions; the arbitration award, therefore, preserved the differing labor structures of the two firms within Pan Am's overall labor structure.

### Procedural Background

The EEOC filed this action against Pan Am in September 1981, alleging that Pan Am's policy towards its sixty year old pilots desiring to serve as flight engineers violated the ADEA. The EEOC sought back pay, liquidated damages, reinstatement, and injunctive and declaratory relief.

The EEOC asserted that Pan Am violated the ADEA by: (1) refusing to permit

pilot/flight engineers to serve as flight engineers past the age of 60, (2) refusing to permit a fifty-nine or sixty year old pilot to displace a flight engineer in the absence of a flight engineer vacancy, and (3) forcing age sixty pilots to retire and forfeit their seniority.

Pan Am claimed that its actions were justified. Pan Am asserted that its policies were necessary to the essence of its business, which is the safe transportation of its passengers, and therefore was justified as a bona fide occupational qualification (BFOQ). Alternatively, Pan Am asserted that pilots approaching age sixty had no right under Pan Am's labor agreements to displace engineers and that pilots displaced by the FAA Age sixty rule need not be provided with another position. Pan Am also noted that few of the claimants bid for available Flight Engineer positions.

This case was originally scheduled for trial in April 1983. The parties filed cross motions for summary judgment that Judge Ingram denied at the pretrial conference. Pan Am's motion for summary judgment argued that its collective bargaining agreement, which prohibited pilots to transfer to a flight engineer position and serve past the age of sixty, constituted a bona fide seniority system.

Shortly after Judge Ingram denied the cross motions for summary judgment, the parties entered into a proposed consent decree. The decree provided for reinstatement of the claimants desiring to return to work, and monetary recovery in equal shares from a total of $250,000. After substantial briefing, negotiations, and modification of the decree, and a fairness hearing held on September 28, 1983, Judge Ingram disapproved the decree. *EEOC v. Pan Am World Airways*, 34 Fair Empl. Prac.Cas. (BNA) 321 (N.D.Cal.1984). Judge Ingram based his decision on the uncertainty in the law in this area, noting that the Supreme Court had accepted *certiorari* in *ALPA v. TWA*, 713 F.2d 940 (2d Cir.), *cert. granted*, 465 U.S. 1065, 104 S.Ct. 1412, 79 L.Ed.2d 739 (1984). In the interim, the case had been reassigned to this court. Judge Ingram denied reconsideration of his decision on April 19, 1984. Pan Am appealed both decisions, but has since stipulated to a dismissal of its appeals.

The Supreme Court issued its decision in *Trans World Airlines v. Thurston*, — U.S. ——, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985), on January 8, 1985. Pan Am immediately requested the Ninth Circuit to remand the case to this court for the limited purpose of considering entering the proposed decree or a modification of it. The Ninth Circuit granted Pan Am's request on February 11, 1985. Applicants proposed the modified Decree that is the subject of this order on July 3, 1985.

*The New Consent Decree*

The Consent Decree proposes several changes in Pan Am's treatment of pilots and flight engineers. Under the agreement, Pan Am will permit all flight engineers to work until they reach the age of seventy. ¶ 3. In addition, all current Pan Am pilots on the Pilot System Seniority List that possess cross bidding rights (that is, all but the former National Airlines pilots) shall be permitted to bid for flight engineer vacancies. ¶ 11. The Decree establishes a notice procedure under which pilots approaching retirement can indicate their interest in becoming engineers.

The Decree provides that Pan Am will pay claimants a total of $1,500,000 in three installments. The first installment, to be paid thirty days after Pan Am receives a form from the claimants releasing Pan Am from any liability relating to its policy towards pilots approaching the age of 60, will equal fifty percent of the total. Each of the next two years, Pan Am will pay an additional twenty-five percent of the total.

The Decree divides the payments among the claimants in the following way: First, Pan Am will reimburse claimants for the costs of attending their depositions, as approved by the EEOC. Second, Pan Am will divide the remaining funds so that the share received by each claimant corresponds to the length of time the claimant has been retired. In other words, a claimant retired for twice as long as a second

claimant would receive a payment twice as large.

The Decree permits the claimants to return to work as flight engineers as long as they can present the appropriate medical certificate and can pass the company physical. Pan Am will offer positions to at least eighteen of the claimants every three months beginning forty-five days after the entry of the Decree. Pan Am will offer these positions to claimants in their order of seniority, except that those claimants who submitted bid forms on Pan Am's approved form will be trained first.

## DISCUSSION

Applicants primarily contend that uncertainties concerning the eventual outcome of litigation of this matter require approval of the proposed Decree. The EEOC also argues that the court must approve the Decree unless its provisions are illegal or grossly unreasonable. Furthermore, the EEOC claims that it is bound by its earlier agreement to the consent decree that Judge Ingram rejected, and that subsequent changes in the law do not permit it to alter its agreement with Pan Am.

The court has received objections from several parties. The objecting claimants argue that the Decree is unreasonable in light of the Supreme Court's recent cases involving age discrimination in the airline industry. They also assert that the EEOC has inadequately represented them. Finally, they contend that Pan Am's financial condition has improved recently; therefore, according to the claimants, applicants cannot justify inadequate monetary relief based on Pan Am's poor financial condition.

Both former National Airlines groups, the former pilots and the former flight engineers, have objected to the Decree. In general, they argue that the Decree interferes with the arbitration decision that integrated the two firms' different labor structures.

■ As a preliminary matter, the EEOC claims that it remains bound by the terms of the 1983 settlement agreement. It claims that a proposed consent decree is like any other contract, and can not be modified unilaterally. The EEOC claims that when Judge Ingram "erroneously" rejected the decree, in March 1984, the EEOC could either have appealed his action or gone to trial, but had no right to modify the decree. The EEOC contends that intervening case law, such as *Thurston,* cannot relieve it of its obligations under the agreement it reached with Pan Am. Indeed, the EEOC states that the only changes it made in the Decree compensated claimants for the salaries they lost from June 1984 to June 1985 when Pan Am appealed Judge Ingram's order, and do not reflect *Thurston's* clarification of the law. (Claimants maintain that the Decree does not adequately compensate them even for this delay.)

There are several problems with the EEOC's argument. First, the Decree, itself, provides that parties can apply to the court "in the event of a change in facts or a change or *clarification,* judicial or otherwise, of the law." ¶ 13 (emphasis added). The EEOC has conceded that *Thurston* clarified the law. Therefore, the EEOC must be arguing that it could not seek to modify the Decree until after the court had approved it. This position seems completely anomolous.

Second, a consent decree, despite the EEOC's arguments, is not like any other contract. "The terms of the decree, unlike those of a simple contract, have unique properties. A consent decree has attributes of both a contract and of a judicial act." *Williams v. Vukovich,* 720 F.2d 909, 920 (6th Cir.1983). *See also United States v. ITT Continental Baking Co.,* 420 U.S. 223, 236 n. 10, 95 S.Ct. 926, 934 n.10, 43 L.Ed.2d 148 (1975) ("Consent decrees and orders have attributes both of contracts and of judicial decrees); 2 A. Larson & L. Larson, *Employment Discrimination,* § 56.23 (1985) (consent decree is a hybrid).

Third, Once Judge Ingram rejected the Decree, and especially after the Ninth Circuit remanded the matter, the parties were free to renegotiate its contents. *See SEC*

*v. Randolph,* 736 F.2d 525, 528 (9th Cir. 1984) (parties bound by an agreement unless the court fails to approve it). Indeed, the parties did renegotiate the provisions for monetary relief, as well as other provisions. Judge Ingram rejected the Decree because he was "reluctant to venture into uncharted waters by approving of the decree at [that] time." *EEOC v. Pan American World Airways,* 34 Fair Empl.Prac. Cas. (BNA) 321, 323 (N.D.Cal.1984). Despite the Supreme Court's "charting of the waters" in favor of the claimants, the EEOC seems to believe that it must again urge a court to approve its once-rejected Decree.

Fourth, it was Pan Am, and not the EEOC, that appealed Judge Ingram's order. The Commission did not appeal because it "believed that the process of resolving the case and returning the aging pilots to work would be accomplished more quickly by trial." Plaintiff EEOC's Reply Memorandum to Objections and Motion to Intervene at 16 n. 4. It is a year and a half after Judge Ingram disapproved the decree and the claimants still have received no relief. Moreover, Pan Am specifically requested a remand so that this court could consider approving the former decree or a modification.

Finally, the EEOC's contention does not address the court's role. Even if the court were to accept the EEOC's argument that, as a matter of law (as opposed to agency policy), it could not alter the terms of its agreement with Pan Am, that in no way binds the court to accept the earlier agreement. The EEOC points to no authority requiring a court to blind itself to recent court decisions that affect the reasonableness of a proposed decree. Indeed, the Decree itself permits either party to seek a modification because of a change in the law after approval of the Decree. Therefore, regardless of the correctness or wisdom of the EEOC's view that it is bound by its proposed agreements despite intervening changes in the law, the court must consider all the law in evaluating the Decree.

*The Appropriate Standard of Review*

"The sole question before the district court in reviewing a settlement agreement is whether the agreement is fundamentally fair or just." *Moore v. City of San Jose,* 615 F.2d 1265, 1271 (9th Cir.1980). The EEOC agrees that this is the correct standard to apply in evaluating the objections of the National Airlines groups (pilots and flight engineers). The EEOC contends, however, that the court should apply a less rigorous standard when scrutinizing the effect of the settlement on claimants' interests. According to the EEOC, absent collusion, illegal conduct, or grossly unreasonable behavior, the district court must defer to the Commission's decision to settle the case on behalf of the claimants.

The EEOC misconceives the proper role of the district court in reviewing a proposed consent decree. It is true that in reviewing a proposed consent decree, the court should not seek to' resolve the underlying factual and legal disputes. *Officers for Justice v. Civil Service Commission,* 688 F.2d 615, 625 (9th Cir.1982), *cert. denied,* 459 U.S. :1217, 103 S.Ct. 1219, 75 L.Ed.2d 456 (1983). In addition, "[t]he proposed settlement is not to be judged against a hypothetical or speculative measure of what *might* have been achieved by the negotiators." *Id.* (emphasis in original). Furthermore, the court notes the importance of voluntary settlements, especially in employment discrimination actions. *See Officers for Justice v. Civil Service Commission,* 473 F.Supp. 801, 803 (N.D. Cal.1979), *aff'd,* 688 F.2d 615 (9th Cir.1982), *cert. denied.,* 459 U.S. 1217, 103 S.Ct. 1219, 75 L.Ed.2d 456 (1983).

At the same time, the court must still examine the reasonableness of the proposed consent decree, and not completely defer to the EEOC's proposal. Courts reviewing both class action settlements and proposed consent decrees in the employment discrimination context have used the standard of fairness, adequacy, and reasonableness. *See* 2 A. Larson & L. Larson, *Employment Discrimination,* § 56.31; *see, e.g., Officers for Justice,* 688 F.2d at

625 ("universally applied standard [for reviewing settlement agreement under Rule 23 (e) ] is whether the settlement is fundamentally fair, adequate and reasonable"); *United States v. City of Alexandria,* 614 F.2d 1358, 1362 (5th Cir.1980) (court will not approve a Title VII consent decree entered into by government and private party if the decree is unreasonable, illegal, unconstitutional, or against public policy); *Williams v. City of New Orleans,* 729 F.2d 1554, 1559 (5th Cir.1984) (court must take active role in approving consent decree since the decree has a continuing effect); *Berkman v. City of New York,* 705 F.2d 584, 597 (2d Cir.1983) (district court should not approve Title VII settlement that contains provisions that are unreasonable, unlawful, or against public policy).

■ The EEOC correctly states that the court should weigh in favor of approving the proposed Decree the participation of a government agency. *See, e.g., Williams,* 729 F.2d at 1560. But government participation in negotiating a consent decree does not insulate the decree from court review; it is simply one factor that the district court should consider in determining the reasonableness of the decree. *See, e.g., Marshall v. Holiday Magic, Inc.,* 550 F.2d 1173, 1178 (9th Cir.1977) (presence of government agency an important factor in considering acceptability of settlement; standard of review, though, remains the same). *See also City of Alexandria,* 614 F.2d at 1362 (applies same standard in evaluating Title VII consent decree as in case brought by private party).

Moreover, the EEOC's participation should not lower the standard of review for evaluating the claims of those on whose behalf the agency proceeds, as argued by the EEOC. Courts consider the participation of the government in deciding on the fairness of a decree precisely because the government represents the interests of all groups, and not just those on whose behalf the government originally filed suit. *See, e.g., City of New Orleans,* 729 F.2d at 1560 (5th Cir.1984). Unlike class representatives, the government has an obligation towards all parties. *See id.* In the present case, the EEOC represents the interests of the former EEOC employees, the claimants, and the public at large to the same degree. Likewise, the court should review the reasonableness of the settlement with respect to each group under the same standard.

The few published cases in which a court has reviewed a proposed consent decree in the ADEA context do not counsel adopting a lower standard of review. In *EEOC v. Eastern Air Lines,* 35 Fair Empl.Prac.Cas. (BNA) 498 (S.D.Fla.1983), fifteen parties sought to intervene after the EEOC and defendants had agreed to a proposed consent decree. The court denied the motion on the basis of the fairness, adequacy, and reasonableness of the decree, citing Title VII cases as support. *Id.* at 502 & n. 12. Moreover, the court stated that "[f]airness is not susceptible of determination in a vacuum, but must be evaluated in light of the strength of the charging parties' case as well as other relevant considerations." *Id.* at 503. The court found that "the charging parties' case was not clear cut." *Id.* On the other hand, *EEOC v. Consolidated Edison Co. of New York,* 557 F.Supp. 468, 470 (S.D.N.Y.1983), suggests that a court has a more limited role in reviewing proposed consent decrees. ("This suit is not a class action nor does it fall within any other of the limited categories of cases in which a Court is called upon to determine the fairness of a settlement.") The court, however, did not elaborate on this reasoning, and later noted that the claimants in that case had only a remote chance of success on the merits. *Id.* at 474.

The court believes that the standard of review of a proposed consent decree should be at least as great in the ADEA context as in the Title VII context. The substantive protections of both Acts are generally to be interpreted in the same way. *See Oscar Mayer & Co. v. Evans,* 441 U.S. 750, 755–56, 99 S.Ct. 2066, 2071–72, 60 L.Ed.2d 609 (1979); *Criswell v. Western Airlines,* 709 F.2d 544, 548 (9th Cir.1983), *aff'd,* ——

U.S. ——, 105 S.Ct. 2743, 86 L.Ed.2d 321 (1985). As discussed above, courts reviewing settlements in the Title VII area uniformly use the standard of fairness, adequacy, and reasonableness.

Furthermore, unlike Title VII, the ADEA does not explicitly provide for intervention by private parties in litigation by the EEOC. In fact, there is a strong argument that the ADEA does not permit intervention. *See* Schlei and Grossman, *Employment Discrimination Law*, 2d ed. at 1168 & n. 143 (1983). Title VII gives the individual victim of discrimination a right to intervene specifically so that he can protect his interests in cases brought by the EEOC. *General Telephone v. EEOC*, 446 U.S. 318, 331, 100 S.Ct. 1698, 1706, 64 L.Ed.2d 319 (1980). The court must be at least as protective of the rights of victims of age discrimination, since their rights of intervention are arguably more limited.

Finally, the court notes that a consent decree, unlike an extrajudicial settlement between two parties, bears the imprimatur of the court. "Judicial approval of a settlement agreement places the power and prestige of the court behind the compromise struck by the parties." *Williams v. Vukovich*, 720 F.2d 909, 920 (6th Cir.1983). The court will not lend its authority to a decree that is not "fair, adequate and reasonable." *Id.* at 921. The court's determination involves balancing several factors including the strength of plaintiff's case; the risk of continued litigation; the presence of a government participant; and the amount offered in settlement. *See Officers for Justice*, 688 F.2d at 615. "The most important factor in determining whether the settlement is fair and adequate is the strength of plaintiff's claims." *Alaniz v. California Processors, Inc.*, 73 F.R.D. 269, 278 (N.D.Cal.1976). "Ultimately, the district court's determination is nothing more than 'an amalgam of delicate balancing, gross approximations and rough justice.'" *Officers for Justice*, 688 F.2d at 625 (quoting *City of Detroit v. Grinnell*, 495 F.2d 448, 468 (2d Cir.1974)).

*Claimants' Objections to the Proposed Consent Decree*

With the above in mind, the court now turns to evaluating the reasonableness of the Decree. The court first notes that the a majority of the claimants (45 of 81) have so far objected to the terms of the Consent Decree. This is powerful evidence that the proposed Decree may not reasonably compensate claimants. A proposed settlement can be fair despite a large number of objections. *See, e.g., TBK Partners v. Western Union Corp.*, 675 F.2d 456, 462 (2d Cir. 1982). "At the same time, the number of objectors must be carefully considered." *Reed v. General Motors*, 703 F.2d 170, 174 (5th Cir.1983); *see also TBK Partners*, 675 F.2d at 462. This is especially true when objectors contend that the proposed recovery is insufficient, rather than that it allocates the amount of recovery inequitably. *See Reed*, 703 F.2d at 174, 175. As stated by the Fifth Circuit, "[w]hile majority rule is not the test in every case, in the context of determining the total back pay award majority sentiment becomes highly relevant." *Pettway v. American Case Iron Pipe Co.*, 576 F.2d 1157 (5th Cir.1978), *cert. denied*, 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979).

The court must consider the "package taken as a whole" in judging the fairness of the Decree. The proposed Decree contains both injunctive and monetary relief. Under the Decree, the 81 claimants will receive a total of $1.5 million. Pan Am will not pay this amount all at once, though; the claimants will divide $750,000 within 30 days of approval of the decree, and another $350,000 each of the following two years. Claimants' primary contention is that the Decree's monetary relief is not a reasonable settlement of their discrimination claims against Pan Am.

Monetary relief is especially important in an age discrimination case such as the present one. *Cf. Gabrielle v. Chrysler Corp.*, 573 F.2d 949, 954 (6th Cir.1978) ("The need for quick dispute resolution is acute in the ADEA context since the very cause of the alleged discrimination, age,

grows daily."). Indeed, in response to a survey conducted by the EEOC in early 1985, 36 claimants indicated a desire to return to flying, 32 stated that they no longer wished to be employed, and 13 did not respond. Declaration of Fritz Wollett ¶ 8. One of the 81 pilots has already died, and is represented in this proceeding by his estate. Reinstatement is a hollow remedy for pilots that can no longer fly because of declining health or atrophied skill caused by involuntary retirement.

In *Officers for Justice*, 688 F.2d at 628, the Ninth Circuit approved a settlement that provided plaintiffs with "only a fraction of the potential recovery." However, "[t]hroughout the lengthy history of [that case], the primary concern of the plaintiffs was to halt the allegedly discriminatory practices and to assure the future integration of minorities and women into the S.F.P.D." *Id.* Plaintiffs in *Officers for Justice* directly benefitted from the injunctive provisions of the consent decree approved in that case. The injunctive provisions here, by contrast, only benefit those who remain able to fly after their long, involuntary retirement. Moreover, even this benefit is of limited value since many of these individuals are nearing the mandatory retirement age of 70.

■ To evaluate the proposed relief properly, the court must first compare it to the amount plaintiffs could potentially recover discounted by the claimants' likelihood of success on their claims. *See, e.g., Reed*, 703 F.2d 170, 172 (5th Cir.1983) ("A district court faced with a proposed settlement must compare its terms with the likely rewards the class would have received following a successful trial of the case."). As discussed above, though, the court should not reach any ultimate conclusions on contested issues of fact or law. *Officers for Justice*, 688 F.2d at 625.

Claimants could potentially recover much more than the Decree presently provides. In estimating plaintiffs' potential recovery, the court assumes that a flight engineer earns an average salary of $60,000 per year. *See* Fourth Declaration of Sanford Rosen, ¶ 17. Counsel at the hearing did not dispute this figure, and counsel for the EEOC stated that flight engineers actually earn $70,000 per year. Based on the actual retirement dates of 13 of the claimants, Pan Am owes claimants an average of $330,000 each. *See id.* Assuming that this group is a representative sample of all 81 claimants, and there is no evidence to the contrary, Pan Am is potentially liable for approximately $26.7 million ($330,000 per claimant multiplied by 81 claimants). Counsel for Pan Am, in response to a question from the court, conceded that Pan Am's liability could be as much as $20 million.

This $26.7 million figure conservatively estimates Pan Am's liability. The $26.7 million does not compensate claimants for inflation or the time value of money. *See Criswell v. Western Airlines*, 514 F.Supp. 384, 396 (C.D.Cal.1981) (granting prejudgment interest at the California statutory rate of seven percent in age discrimination action). In addition, if Pan Am flight engineers actually earn $70,000 per year, as suggested by counsel for the EEOC, Pan Am's liability would increase by approximately $4.5 million. Furthermore, the $26.7 million figure is current only through August 1985; each month Pan Am incurs an additional liability of approximately $320,000 ($4,000 per month in salary multiplied by 81 claimants).

Pan Am could face even greater liability. If this case were to go to trial, a court could award front pay to the claimants. *See, e.g., Goldstein v. Manhattan Industries, Inc.*, 758 F.2d 1435, 1448, 1449 (11th Cir.1985) ("an award of front pay ... may be an appropriate remedy in an age discrimination suit because reinstatement would be impracticable or inadequate."); *Cancellier v. Federated Department Stores*, 672 F.2d 1312, 1319, 1320 (9th Cir.) (damages in lieu of reinstatement permissible in ADEA case in which employee and employer can no longer coexist in a working relationship), *cert. denied*, 459 U.S. 859, 103 S.Ct. 131, 74 L.Ed.2d 113 (1982). This case, originally filed in 1981, may have

engendered the type of atmosphere in which a court would award front pay.

Pan Am also faces the possibility of liability for double damages for willfully violating the ADEA. *See* 29 U.S.C. § 626(b). A violation of the Act is willful if an employer either knows its behavior violates the Act or shows reckless disregard for the Act's requirements. *Trans World Airlines v. Thurston*, —— U.S. ——, 105 S.Ct. 613, 624, 83 L.Ed.2d 523 (1985). An employer can violate the Act willfully without having "an evil motive or bad purpose." *Id.* 105 S.Ct. at 624 n. 19.

In *Thurston*, the Supreme Court reversed the Second Circuit's finding that TWA willfully violated the Act. The Court found that "TWA officials acted reasonably and in good faith in attempting to determine whether their plan would violate the ADEA." *Id.* at 626. After meeting with its attorneys to discuss the effect of the 1978 amendments to the ADEA, TWA adopted a plan that would permit 60 year old pilots in "flight engineer status" to continue working for the airline. *Id.* TWA adopted this policy over the vehement objections of the Air Line Pilots Association, which filed a separate lawsuit against TWA. *Id.*

TWA, thus, immediately examined the legality of its policies under the ADEA and, in 1978, became "the only trunk airline that voluntarily ... permitted [persons] over 60 to continue working as flight engineers." *Id.* at 625 n. 23 (quoting *Thurston v. Trans World Airlines*, 713 F.2d 940, 957 (2d Cir. 1983) (Graafeiland, J., dissenting)). Within months after Congress amended the ADEA, TWA permitted pilots to bid for flight engineer vacancies, which allowed them to work beyond 60. Pan Am, in sharp contrast, did not permit pilots to bid for vacancies and remain with the airline past the age of 60 until 1983, five years after the amendments to the ADEA. Unlike TWA, which sought, though unsuccessfully, to comply with the ADEA, Pan Am did not alter its policy towards its pilots in response to the 1978 amendments. While the court does not find that Pan Am would

be liable for willfully violating the Act, the possibility of double damages in this case does dramatically raise Pan Am's potential liability.

Moreover, the $1.5 million that the Decree offers to claimants is less than first appears. Claimants would receive only half of this amount now, and the remainder over a two year period. They receive no compensation for the effects of inflation or the interest they have foregone.

In sum, Pan Am faces a potentially substantial liability. Indeed, counsel for Pan Am conceded that Pan Am could be liable for $20 million. The Consent Decree offers claimants $1.5 million, spread out over 2 years with no compensation for inflation or the time value of money. The fairness of reducing claimants' potential recovery to this extent turns on the strength of claimants' underlying claim.

*The Strength of the Claimants' Case*

The major dispute between claimants and applicants concerns the effect on the present case of recent decisions involving age discrimination claims brought by pilots against airlines. The EEOC originally argued that Pan Am violated the ADEA by not permitting age 60 pilots to displace (or "bump") flight engineers and continue flying. Pan Am argued that it permitted pilots to displace flight engineers only in the limited circumstances permitted under its collective bargaining agreement, a bona fide seniority system. Claimants argue that the Supreme Court's recent decision in *Trans World Airlines v. Thurston*, —— U.S. ——, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985), establishes that Pan Am's policy violated the ADEA.

Pan Am also contends that its policy of not permitting pilots to serve as flight engineers past the age of 60 may be justified as a "bona fide occupational qualification (BFOQ)." Pan Am argues that *Johnson v. American Airlines*, 745 F.2d 988 (5th Cir. 1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 3500, 87 L.Ed.2d 631 (1985), provides support for this position. Claimants assert that *Johnson* is distinguishable from the present case, and that it provides little sup-

port for Pan Am now that the Supreme Court has issued *Thurston.*

## The Effect of Thurston

*Thurston,* like the present proceeding, involved an airline's treatment of age 60 pilots. In 1977, TWA and the Air Line Pilots Association (ALPA) entered into a collective bargaining agreement under which all employees in a cockpit position would retire at age 60. This provision was lawful under the ADEA as a "bona fide seniority system." Effective April 6, 1978, Congress amended the ADEA to prohibit the mandatory retirement of an individual because of his age. In response to the 1978 amendments to the ADEA, and over opposition from its union, TWA changed its treatment of age 60 pilots. TWA began permitting any employee in "flight engineer status" to continue working beyond the age of 60. A captain could obtain "flight engineer status" by bidding for a position under the collective bargaining agreement. He would receive a position only if there was a vacancy. *Id.* 105 S.Ct. at 618–19.

A captain displaced for reasons other than age did not need to use the collective bargaining procedures. For example, if TWA eliminated a captain's position because of reduced manpower needs, the captain could bump a less senior flight engineer. Similarly, captains displaced for medical reasons, or other reasons relating to their competency to serve, could automatically bump flight engineers. *Id.* at 619.

The Supreme Court unanimously held that TWA's policy violated the ADEA. "The Act does not require TWA to grant transfer privileges to disqualified captains. Nevertheless, if TWA does grant some disqualified captains the 'privilege' of 'bumping' less senior flight engineers, it may not deny this opportunity to others because of their age." *Id.* at 621. Moreover, TWA could not defend its policy as part of a "bona fide seniory system." "[A]ny seniority system that includes the challenged practice is not 'bona fide' under the statute. The Act provides that a seniority system

may not 'require or permit' the involuntary retirement of a protected individual because of his age." *Id.* at 623.

In many ways, TWA treated its age 60 pilots more even-handedly than Pan Am did. Beginning in 1978, TWA permitted age 60 pilots to bid for flight engineer vacancies. Pan Am did not permit pilots approaching age 60 this privilege until 1983, two years after the commencement of this action. Pan Am, however, had permitted younger pilots to bid for flight engineer vacancies ever since 1963. At Pan Am, unlike TWA, a pilot approaching age 60 could not even take advantage of a flight engineer vacancy so that he could continue flying.

Moreover, Pan Am's policy regarding a pilot's ability to bump a flight engineer seems directly analogous to TWA's. At Pan Am, like TWA, a pilot displaced because of a reduction in the airline's need for pilots could displace less senior officers, including flight engineers. In addition, on one occasion Pan Am permitted a pilot disqualified for medical reasons to serve as a flight engineer. Indeed, Pan Am still does not permit a pilot approaching the age of 60 to displace a flight engineer.

Pan Am contends that its actions are distinguishable from TWA's. It argues that since it did not automatically permit a displaced pilot to bump a flight engineer, it did not violate the ADEA. Pan Am misapprehends the meaning of *Thurston. Thurston* specifically stated that an airline could not "grant *some* disqualified captains the 'privilege' of 'bumping' less senior flight officers," while "deny[ing] this opportunity to others because of their age." *Id.* 105 S.Ct. at 621 (emphasis added). A Pan Am pilot displaced because of his age could never displace a flight engineer, while pilots displaced for other reasons could. The fact that TWA permitted pilots displaced for reasons other than age greater opportunities to displace flight engineers than Pan Am did does not make Pan Am's policy less discriminatory. Discrimination cannot be quantified in this way; an employer either deprives an employee a privilege of employ-

ment because of the employee's age or it does not. Pan Am deprived its age 60 pilots of privileges available to other employees.

The EEOC implicitly acknowledges that Pan Am's policy violates *Thurston.* Unlike Pan Am, the EEOC speaks of *Thurston*'s "clarification of the law governing the rights of age–60 pilots to transfer to flight engineer positions." Plaintiff EEOC's Reply Memorandum to Objections and Motion to Intervene at 1. Instead of arguing that the law remains uncertain, as Pan Am does, the EEOC contends that recent cases "do not give the Commission the right to change the terms of the settlement reached in 1983 when the law was much less certain and the risks of litigation substantially greater." Reply Memorandum at 13. The EEOC does concede that "[i]t is unfortunate, perhaps, that the Commission's lawyers were not blessed with greater foresight so that they could have anticipated in early 1983 the ultimate outcome in *TWA* and *Western.*" Reply Memorandum at 28.

Furthermore, Pan Am would have great difficulty claiming that its policy resulted from a bona fide seniority system. *Thurston* specifically held that a seniority system that required or permitted the involuntary retirement of a protected individual because of his age was not bona fide under the Act. *Thurston,* 105 S.Ct. at 623. Pan Am's seniority system seems to come within this language.

*The Effect of Johnson*

Pan Am contends that it based its policy towards 60 year old pilots on a bona fide occupational qualification. Pan Am argues that its policy of not permitting former captains to become flight engineers was designed to prevent the effects of "command syndrome." Command syndrome occurs, according to Pan Am, when a senior airman placed in a subordinate position mentally or physically resumes his former role as captain, especially during emergencies. (In common terms, and in *Johnson,* this phenomenon is called "back seat driving.") Command syndrome can interfere with the new captain's commands, or divert

the attention of the engineer himself. In either case, according to Pan Am, command syndrome endangers passenger safety— the essence of its business. Claimants contend that *Johnson* does not provide authority for Pan Am's claimed defense.

Plaintiffs in *Johnson* challenged American's policy of requiring all members of the cockpit crew, including flight officers (the equivalent of Pan Am's flight engineers), to retire or transfer to non-cockpit positions at age 60. American, like Pan Am, operated its aircraft with a three-person crew that included a flight officer who did not actually pilot the plane. Unlike Pan Am, however, American did not allow any individual who could not ascend to the rank of captain to remain in the cockpit. American argued that employing ex-captains as flight officers would both block the advancement of other cockpit crew members to the pilot position, and present a safety hazard since former pilots might revert to their old roles during emergencies. 745 F.2d at 991. The Fifth Circuit affirmed a jury verdict that American Airlines had established a BFOQ defense.

■ A court should use a two-part inquiry for deciding the merits of a BFOQ defense. *Western Airlines v. Criswell,* — U.S. ——, 105 S.Ct. 2743, 2753, 86 L.Ed.2d 321 (1985). First, the qualification that the employer claims it is seeking must be reasonably necessary to the essence of its business. *Id.* 105 S.Ct. at 2751. Second, the employer can rely on a particular age as a proxy for safety-related job qualifications only when it is compelled to do so. The employer can establish this in one of two ways: First, the employer can show that it had a factual basis for believing that all or substantially all of the persons over the particular age would be unable to perform the job safely. Alternatively, the employer can establish that it is impossible or highly impractical to deal with employees on an individualized basis. *Id.* at 2752.

In *Johnson,* defendant introduced sufficient evidence to support a BFOQ defense. Defendant presented evidence that permitting pilots to become flight officers would

block the training position for future pilots and endanger safety. Defendant also presented two expert witnesses who testified that the presence of senior ex-captains as flight officers created a possibly dangerous situation. The expert witnesses testified that it was impossible to determine which ex-captains would pose a safety hazard.

*Johnson*, however, does not provide Pan Am with a strong defense of its policy. First, *Johnson* is of little precedential weight. Plaintiffs in *Johnson* had failed to move for a directed verdict or judgment notwithstanding the verdict. Therefore, the court limited its review "to whether there was *any* evidence to support the jury verdict." 745 F.2d at 994 (emphasis in original).

Second, *Johnson* specifically declined to decide whether an employer could use a BFOQ defense when it made exceptions to its general policy. *Id.* at 994 n. 4. The court noted that that question was pending before the Supreme Court in *Thurston*, and stated that the issue had not been presented to it. *Thurston*, as discussed above, held that an employer cannot deny employees based on age the privileges it grants other employees.

Pan Am permits numerous exceptions to its general policy of preventing senior pilots from flying as flight engineers. These exceptions undermine Pan Am's contention that its policy is based on safety concerns. Pilots can become flight engineers in lieu of furlough, for example. One pilot that no longer qualified for a first class medical certificate also began flying as a flight engineer. Indeed, Pan Am's policy since 1983 of permitting pilots approaching age 60 to bid for flight engineer vacancies belies its argument that permitting senior pilots to fly as flight engineers would endanger the safety of the flying public. Pan Am has also permitted former pilots Kiehl and Hazelwood, who brought a separate age discrimination suit against Pan Am, to return as flight engineers. The Supreme Court has rejected a BFOQ defense precisely because the employee was "able to point

to reputable businesses in the same industry that ... eschew[ed] reliance on mandatory retirement earlier than 70." *Western Airlines v. Criswell*, —— U.S. ——, 105 S.Ct. 2743, 2756, 86 L.Ed.2d 321 (1985). Claimants can point both to other reputable businesses in the same industry, such as TWA, and to Pan Am's practice, itself, in refutation of any evidence of safety concerns that Pan Am could offer. Finally, the Supreme Court has recently stated that "like its Title VII counterpart, the BFOQ exception 'was in fact meant to be an extremely narrow exception to the general prohibition' of age discrimination contained in the ADEA. *Criswell*, 105 S.Ct. at 2751 (quoting *Dothard v. Rawlinson*, 433 U.S. 321, 334, 97 S.Ct. 2720, 2729, 53 L.Ed.2d 786 (1977)).

*Pan Am's Financial Status*

Claimants contend that Pan Am's recently improved financial position permits Pan Am to increase the monetary compensation it has offered them. Pan Am does not specifically contradict this statement, but recites financial statistics that ostensibly establish Pan Am's weak financial health. Neither party has demonstrated Pan Am's actual financial status. Pan Am cites its losses for the years 1980–1984 without giving a sense of the airline's current condition, or the breakdown by year of these losses. In addition, even these statistics only account for the losses of Pan American World Airways, excluding World Services and Pan American Corporation. The court has no basis for determining the nature of the relationship among these various related entities. Moreover, Pan Am does not provide any data on the effect that a larger settlement would have on its financial health or the current economic viability of the airline. Claimants' data consist of newspaper and magazine articles discussing Pan Am's economic prospects. The court cannot draw conclusions of any kind regarding Pan Am's financial condition based on the sketchy data presented by the parties.

*Claims of Third Parties*

*Objections of Former National Airlines Flight Engineers and Pilots*

The former National Airlines flight engineers object to paragraph 14 of the Decree, which provides:

> The terms of the Award of Lewis M. Gill dated March 12, 1981, remains [sic] unchanged, but shall not be a bar to the right of a claimant or current pilot who possesses cross-bidding rights to be awarded or be assigned to a Flight Engineer position under the terms of this Consent Decree.

According to the NAL engineers, this paragraph would impermissibly destroy their legitimate expectations and lawful rights by permitting the 81 claimants and all future Pan Am pilots to transfer to engineer positions held by former National Airlines employees.

The former National Airlines Pilots also base their objections on the terms of the Gill award. Under the award, until the end of 1985, furloughs alternate between Pan Am employees and former National Airlines employees. The former National pilots bear ⅔ of the burden of the furloughs borne by former National employees. They argue that the Decree may force the furlough of some former National pilots.

Pan Am correctly notes that this situation will almost inevitably not occur. The first flight engineers trained under the Decree would not likely be able to assume positions for three or four months. As it is already the end of October, and the court disapproves the Decree, the alternating system will not be in effect if and when the first newly trained flight engineers are ready to assume their positions.

The former National Airlines pilots also assert that they will lose positions in the future as a result of the Decree. They argue that some of the engineers displaced by pilots in the future may, in turn, be able to displace former National pilots with less seniority.

The heart of both groups' claims is that the Decree would upset the provisions of the Gill Award, described above, which merged the seniority lists of Pan Am and the former National Airlines. Under the Gill Award, the seniority systems of the different employee groups remained, in effect, substantially the same as before the merger; former National pilots and engineers continued to have no bidding rights whatsoever for each other's positions. Indeed, the former National groups are in separate bargaining units from the Pan Am groups. Since former National employees were not involved in any way with the practices challenged by the EEOC, and because the Decree does not benefit any former National employees, they object to the Decree.

During the course of the fairness hearing, counsel for applicants contended that the Decree would not interfere with the provisions of the Gill Award. Counsel argued that disputes involving interpretation of the Gill award could be solved by arbitration, as the Award provides, notwithstanding the Decree. In response to a suggestion from the court, counsel agreed to rewrite paragraph 14 of the Decree to reflect this understanding that the proposed Decree would not interfere with the Gill Award and its mechanisms for resolving disputes concerning its interpretation. The court believes that this reasonably resolves the dispute between applicants and the National Airlines groups as it preserves their right to arbitrate any disputed interpretation of the Gill Award without the bar of a federal judgment.

*Objections of Intervenors Rankin et. al.*

Rankin, a furloughed Pan Am pilot/flight engineer (as are his fellow intervenors), claims that the Decree violates the terms of the Employee Retirement Income Security Act (ERISA). Rankin raises two arguments: First, he claims that returning and current pilots are not eligible for retirement benefits, as the Decree seemingly provides. Second, he contends that Pan Am has breached its fiduciary duty to the participants in the plan by using retirement funds to settle its dispute with the EEOC. Pan Am disputes Rankin's arguments.

The Consent Decree does not establish that pilots who become flight engineers are automatically entitled to receive retirement benefits while working. The Decree only states that returning pilots "shall receive such benefits ... to which they are entitled in accordance with the terms of the plans as of the their normal retirement date as a pilot." ¶ 9. These are funds that the returning pilots would receive whether or not they returned as flight engineers.

Moreover, the court need not presently determine whether returning flight engineers are entitled to continue to receive pension benefits. Pan Am's plan specifically provides for a dispute resolution procedure, as required by ERISA. *See* 29 U.S.C. § 1133. Indeed, the Ninth Circuit requires that a party exhaust his administrative remedies before bringing an ERISA claim to the court. *See Amato v. Bernard,* 618 F.2d 559, 566, 567 (9th Cir.1980). As with the claim by the former National employees, the court finds that it would be reasonable to require intervenor Rankin to use the appropriate dispute resolution mechanisms instead of resolving his claim first at the federal court level. *See id.* at 568 ("[P]rior fully considered actions by pension plan trustees interpreting their plans and perhaps also further refining and defining the problem in given cases, may well assist the courts when they are called upon to resolve the controversies.").

*On Claimants' Motion to Intervene*

The objecting claimants have moved to intervene for the limited purpose of objecting to the proposed Decree. Pan Am asserts that claimants have no statutory right to intervene in any aspect of this action. They argue that the statutory scheme presumes that the EEOC is an adequate representative, and vests the EEOC with the exclusive right to pursue claims it has filed. The EEOC does not object to the claimants' intervention for the limited purpose they seek.

Section 7(c)(1) of the ADEA, 29 U.S.C. § 626(c)(1), provides:

Any person aggrieved may bring a civil action in any court of competent jurisdiction for such legal or equitable relief as will effectuate the purposes of this chapter: Provided, That the right of any person to bring such action shall terminate upon the commencement of an action by the [EEOC] ... to enforce the right of such employee under this chapter.

Courts and commentators disagree on the extent to which this provision prevents intervention in ADEA actions brought by the EEOC. *See, e.g., EEOC v. Boeing,* 37 Fair Empl.Prac.Cas. (BNA) 1657 (W.D.Wash. 1985); Schlei and Grossman, *Employment Discrimination Law,* 2d ed. at 1168 & n. 143 (1983). The EEOC has not taken an official position on this issue.

■ The court need not enter this fray since claimants presently seek to intervene only to object to the Decree. In *Boeing,* airline pilots who were being represented by the EEOC in an ADEA action against Boeing sought to intervene. The court rejected both mandatory and permissive intervention as counter to the statutory scheme of the ADEA. The court did, however, permit "limited participation" under its equitable powers. *Id.* at 1660. The pilots' status was a "hybrid ... fall[ing] somewhere between that of an *amicus* and an intervenor." *Id.* at 1657 n. 2. The court cited the EEOC's lack of opposition to limited participation in support of its order. *Id.* Similarly, the EEOC in this proceeding has not objected to the claimants motion to intervene for purposes of objecting to the consent decree. The court, analogously to *Boeing,* permits claimants to intervene for the limited purpose of objecting to the Decree.

## CONCLUSION

■ After carefully considering applicants' arguments, and the objections of the various parties, the court disapproves the Decree. The settlement agreement offers claimants inadequate compensation for their years of involuntary retirement. In addition, a majority of claimants have formally objected to the Decree. Despite the government's participation in this action, and the preferred place of settlements in

employment discrimination actions, the court cannot approve the Decree.

IT IS SO ORDERED.