Marvin D. WILKERSON, et al., Plaintiffs,

v.

MARTIN MARIETTA CORPORATION, a Maryland corporation, Defendant.

Civil Action Nos. 91–D–2078 (Consolidated with 92–D–969, 92–D–1557, 93–D–130, 93–D–385, 93–D–396, 93–D–1501, 94–D–1247, 95–D–1316).

United States District Court, D. Colorado.

April 14, 1997.

278

Kathryn Miller, Miller & Steiert, Litteton, CO, Gregg C. McReynolds, Englewood, CO, Todd J. McNamara, Denver, CO, Frank Lopez, Equal Employment Opportunity Commission, Denver, CO, for Plaintiffs–Petitioners.

John R. Webb, Kathrine J. Peck, Holme, Roberts & Owen, Denver, Co, Daniel S. Hoffman, McKenna & Cuneo, Denver, CO, Michael J. Kramer, MMC Legal Department, Denver, CO, for Defendant–Respondent.

## ORDER APPROVING CONSENT DECREE

DANIEL, Judge

THIS MATTER is before the Court in connection with the Consent Decree entered into between the Equal Employment Opportunity Commission ("the EEOC") and Martin Marietta Corporation, now known as Lockheed Martin Company ("MMC") (collectively "the Parties"). A hearing regarding the fairness, reasonableness and adequacy of the Consent Decree was held March 5, 1997, where the Court heard argument from the Parties and testimony from persons who voiced objections to the proposed Consent Decree. This Order explains the findings and reasons which support my conclusion that the Consent Decree is fair, adequate and reasonable.

### I. BACKGROUND OF THE CASE

This case arose out of charges of age discrimination that were filed during the substantial layoffs at MMC's Astronautics Group (MMAG) from 1990 through 1994. The Parties agree that there was an overall reduction from 11,000 employees in 1990 (excluding employees under union contract who have not been the subject of the litigation) to approximately 6,000 by the end of 1993 at the Denver facilities of MMAG. The reductions impacted employees of all ages, labor grades and job assignments. Of the employees who were laid off, 180 filed charges of age discrimination and 112 opted in as plaintiffs in private lawsuits (some of whom were among the 180 charging parties).

The EEOC alleges that it began receiving charges in 1990 from MMC employees age 40 and over alleging that MMC was engaged in discrimination. Although the EEOC issued "no cause" determinations on some individual charges of age discrimination involving layoffs between 1990 and 1992, additional charges were filed with the EEOC in increasing numbers during the remaining years of the layoffs. In response to these charges, MMC denied that it had discriminated. The EEOC started to investigate the possibility of a pattern and practice of discrimination in late 1991.[1] In response, MMC protested the collective investigation and maintained that the charges were individual discrimination claims and should be processed as individual charges.

On December 11, 1992, the EEOC issued an administrative subpoena identifying a number of Charging Parties and requesting production of a broad scope of MMC records that would form the basis of a statistical analysis of the layoffs. Although there were disagreements between MMC and the EEOC regarding the scope of the data request, MMC ultimately produced the data on the demographics of the layoffs for 1990 through 1992. On May 25, 1993, the EEOC issued its Letters of Determination finding against MMC on the issue of whether age was a factor in a pattern of layoffs. The EEOC invited MMC to participate in statutorily mandated conciliation and advised that litigation was the likely consequence of a failure to conciliate. After formal efforts at conciliation were unsuccessful, the EEOC filed its enforcement action in this Court on May 26, 1994, alleging a pattern and practice of age

---

1. The investigation was limited in geographic scope to the Astronautics Group and the Information Systems Group in Colorado since the charges involved these areas of MMC's work force.

discrimination in layoffs affecting employees of MMAG age 40 and over between the dates of January 1, 1990 and October 31, 1992.[2]

When the EEOC's original complaint was filed, there were already pending many individual age discrimination cases and one "representative" action. The previously filed individual cases and the EEOC's action were consolidated into one omnibus case bearing the caption of *Wilkerson, et al. v. Martin Marietta,* Civil Action Number 91–D–1078. The pending private actions presented a vehicle by which persons now objecting to the Consent Decree could have pursued a direct action on their own behalf to protect any claimed right or interest arising from their layoff.

The initial representative action, *Floss, et al v. Martin Marietta Corp.,* Civil Action Number 93–D–385, defined the group represented by former employees laid off in 1990 through 1992. Persons were permitted to opt in to that action at any time from February 19, 1993, up to the filing of the action by the EEOC, a period of 15 months. A total of only 85 former employees chose to opt into that action. Another individual action, *Johnson. et al. v. Martin Marietta Corp.,* Civil Action Number 95–D–1316, was filed on behalf of employees laid off in 1993.. Notices were mailed to all former employees age 40 and older who were laid off in 1993 giving each individual an opportunity to join in the *Johnson* action. Of the 1,064 former employees notified of their eligibility to opt in to the case, only 19 elected to opt in. I note for the record that none of the persons who have filed objections to the Consent Decree (collectively "the Objectors") joined in either of these lawsuits. Further, none of the Objectors filed separate lawsuits against MMC.

The EEOC filed an Amended Complaint on November 20, 1996, seeking to expand the scope of the litigation to include claims on behalf of older workers who were laid off through 1994. This amendment was a consequence of the EEOC's ongoing investigation and matters that were agreed to during the 1996 mediation process, described below. In fact, the EEOC asserts that a negotiated

term of the settlement was MMC's agreement to stipulate to a complaint amendment to expand the representative class by adding persons who suffered layoffs between October 1, 1992, through December 31, 1994. I granted the Motion to Amend the Complaint on November 21, 1996.

## II. *THE MEDIATION*

In January 1996, after four years of investigation, conciliation and litigation, the Parties, including the plaintiffs represented by attorney Todd McNamara (the "Private Plaintiffs"), began discussing mediation with a view toward the possible settlement of all or some of the cases. Even after agreeing to mediate, the Parties assert that they had a number of disputes concerning the process itself, For example, the Parties assert that they could not agree on a single mediator and, thus, through negotiation, agreed to use two mediators, both former judges, to mediate the dispute.

The Parties engaged the services of a highly respected mediation service, Judicial Arbiter Group, and, in particular, the services of retired District Court Judge Richard Dana and former Colorado Supreme Court Justice William Neighbors (the "Mediators"). The Parties advise that it took them over a month to negotiate the terms and conditions of the mediation process. The Parties executed a written Memorandum of Understanding on April 5, 1996.

As part of the mediation agreement, the Parties embarked on extensive discovery. Each side was permitted 160 hours of depositions. The plaintiffs (both the EEOC and the Private Plaintiffs) deposed the past and present Presidents of MMAG; the past and present Vice Presidents of Human Resources; a Corporate Vice President of Human Resources; six other Human Resources Representatives; two EEO Department Representatives; and four other management level employees of MMAG. MMC deposed 17 opt-in plaintiffs and 30 class members represented by the EEOC, including former supervisors who were decision-mak-

---

**2.** According to the EEOC, the original complaint covered this limited temporal scope because this

was the period of time covered by the original charges, investigation and conciliation.

ers in some of the cases. The mediation agreement also required MMC to produce 275 boxes of documents, which were supplemental to the voluminous documents produced during discovery in the consolidated cases and in the EEOC's administrative proceeding.

The next phase of the mediation was a three-day presentation to the Mediators by the Parties on both liability and damage issues. Each of the Parties submitted written position statements, exhibits, other evidence, and opening and closing statements to the mediators. As a further illustration of the thoroughness of the mediation, ten expert witnesses and three lay witnesses made presentations. The EEOC and MMC informed this Court that the mediation presentations made it clear that the facts and law concerning both liability and damages were hotly contested by the Parties.

After the mediation presentations were completed and a several day break was taken which allowed the Parties and the Mediators to evaluate what had transpired, the Mediators engaged the EEOC and MMC in several sessions of actual settlement negotiations. The negotiations took place over 11 days and the sessions themselves lasted 90 hours. The formal negotiations facilitated by the Mediators were followed by weeks of intense negotiations between the EEOC and MMC concerning the actual language and terms of the agreement. The negotiations encompassed at least 20 face-to-face sessions between the Parties. As a result of these marathon sessions, the EEOC and MMC, on August 8, 1996, reached an agreement in principle regarding the basic terms of settlement.[3]

## III. THE TERMS OF THE PROPOSED CONSENT DECREE

The Consent Decree was preliminarily approved by the Court on November 21, 1996. The Parties stipulate that the numbers of employees affected by the Consent Decree, and the number who could eventually participate in the settlement, total 3459 former employees age 40 and over. They were designated on Attachments A and D of the Consent Decree (the "Eligible Claimants" or "Claimants").[4] To participate in the settlement proceeds, a Claimant was not required to provide any evidence to support his or her claim of discrimination. Rather, a Claimant need only have claimed to have left MMC's employ involuntarily by layoff between January 1, 1990, and December 31, 1994, and been age 40 or older at the time of his or her termination. I will now outline the main provisions of the Consent Decree.

### A. Monetary Benefits of The Settlement

The Consent Decree provides for cash payments to the Eligible Claimants in the amount of $13,000,000.00, less taxes. (Consent Decree, Section V(A), (F)). Each Eligible Claimant who submitted a timely claim form and release shall receive a share in the settlement fund "the amount of which will vary depending on the number of years that have elapsed since termination, labor grade at time of termination and age at termination." (Id., Section V(C)). The Parties estimate that payments to Eligible Claimants will range from approximately $1,400.00 to $11,700.00, less taxes. In addition to these payments, 70 individuals who filed timely charges with the EEOC and thus preserved their private right to sue will receive an additional $10,000.00 to $15,000.00. (Id., Section V(D)).

MMC is responsible for making federal, state, and local income tax deductions and FICA deductions from these amounts before payments are distributed to Eligible Claimants. (Id., Section V(F,G)). MMC also will be responsible for paying on behalf of Eligible Claimants an additional $991,000.00,

---

**3.** Private settlement agreements were later reached with the Private Plaintiffs.

**4.** That number includes approximately 1420 employees who had been classified as "voluntary" on the records of MMAG. Those former employees were sent separate notices offering them the opportunity to challenge the voluntary designation of their layoffs so that they could participate in the distribution of the fund. Approximately 185 out of the 1420 filed a challenge to the designation of voluntary, of which the EEOC has allowed 167 to participate in the settlement.

which represents its share of FICA and Medicare taxes. (*Id.*).

## B. *Employment Benefits*

### 1. *Rehiring of 450 Eligible Claimants*

The Consent Decree provides for MMC to rehire 450 Eligible Claimants into jobs that are comparable in labor grade and salary to the position last held by each Claimant that is rehired. (*Id.*, Section IX). This includes the Claimants MMC has already rehired since August 1, 1996, and any Private Plaintiffs rehired prior to or during the term of the Decree. (*Id.*). The reemployment of such Claimants is subject to a sufficient number of open requisitions to be filled with outside hires and a sufficient number of eligible employees applying for and accepting positions. (*Id.*). MMC shall make a good faith effort to meet this hiring goal within two (2) years following the Court's final approval of the Consent Decree. (*Id.*). The Consent Decree further provides that during the term of the Decree, MMC may terminate any hired Eligible Claimants on a for-cause basis and may conduct reductions in force subject to Section X. (*Id.*).

### 2. *Outplacement Services and The Evening Institute*

In addition to the rehiring provisions, the Decree provides that MMC shall provide training and outplacement services. (Id., Section XI). Specifically, "Eligible Claimants who are rehired shall be entitled to participate in the Evening Institute on the same basis as other employees and in the Career Center if subsequently laid off." (*Id.*) Further, "MMC shall at its sole expense make available to Eligible Claimants who have not been rehired, but who have timely indicated on their claim forms a desire to participate in training, outplacement or both ... two classes per term at MMC's Evening Institute in the Denver metropolitan area ... to a maximum of 8 classes per Eligible Claimant ... and [n]ot more than two consecutive years of outplacement services at MMC's Career Center in the Denver metropolitan area." (*Id.*)

## C. *Affirmative Relief Provision* s

The Consent Decree provides that during its five (5) year term, MMC will not undertake any reductions in force that discriminate against employees age 40 and over or retaliate against or adversely impact any person because he or she filed charges of discrimination or assisted in this case. (*Id.*, Section IV). If future reductions in force are necessary, MMC must record the reasons for each employee layoff action. (*Id.*, Section X(A)). However, this does not impose any obligation on MMC to postpone or change the layoff, even if EEOC disputes MMC's compliance with the notice provisions. (*Id.*, Section X(B)). Further, prior to the implementation of any future layoffs, MMC must conduct a statistical analysis to see if the layoff falls disproportionately on persons age 40 and over. (*Id.*, Section X(C)). "If any statistical analysis preliminarily indicates that proceeding with the reduction in force as planned would adversely impact protected age group members, based on statistical significance," then the Vice President of Human Resources must separately review and approve the layoff and, if approved, set out the reasons for the approval in writing. (*Id.*, Section X(C)).

The Consent Decree also requires MMC to train its Denver Astronautics Group personnel who hold certain supervisory positions. (*Id.*, Section XII). This training will cover MMC's obligations under the Decree and the ADEA, as well as "objective, non-discriminatory decision-making and proper procedures for evaluations, reductions in force and layoffs." (*Id.*, Section XII(A)(1)). MMC also must develop and present to the EEOC "a copy of its written non-discrimination policy which establishes specific procedures for receiving, investigating and resolving complaints of discrimination lodged by any employee." (*Id.*, Section XIII(A)). MMC is required to post the Consent Decree in the workplace and to make periodic reports to the EEOC. (*Id.*, Sections XIV, XV).

Finally, the Consent Decree gives the EEOC the right to review compliance with the Consent Decree's terms at MMC's facilities located within Colorado, and requires MMC to provide the EEOC with access to personnel records to ensure compliance with

all terms of the proposed Consent Decree. (*Id.,* Section XVI). Further, the Decree provides for the Court to retain jurisdiction over the Decree for five (5) years for purposes of compliance. (*Id.,* Section III(A)). The EEOC asserts that these measures are designed to prevent MMC from unlawfully considering age in employment decisions, and to allow employees to more easily report future violations to the EEOC.

## IV. *NOTICE GIVEN TO CLAIMANTS OF CONSENT DECREE AND THEIR RESPONSE THERETO*

Following the Court's preliminary approval on November 21, 1996, and in accordance with the terms of the Decree, the EEOC notified Eligible Claimants in writing of the terms of the settlement. (Exhibit F to Consent Decree). Among other things, that notice indicated that Claimants were required to submit a claim form to participate in the settlement and that at the hearing on March 5, 1997, the Court would consider the fairness of the Consent Decree. [*Id.* at pp. 6–7].

The claim forms (Exhibit E to the Consent Decree) specifically requested that Claimants indicate whether they did or did not object to the Consent Decree. [*See* Exhibit E at p. 3]. Of the 1,777 Eligible Claimants who submitted claim forms, the EEOC states that approximately 1,663 indicated that they did not want to object to the Consent Decree. Thus, only 114 of the Eligible Claimants, or 6.4 percent, objected to the Consent Decree.[5] The objections generally fall into the following categories: (1) insufficient monetary provisions; (2) insufficient non-monetary provisions; (3) inadequate representation by the EEOC; (4) inequities in the distribution formula; and (5) miscellaneous matters. My analysis of the objections is addressed in Section VII of this Order.

## V. *STANDARD OF REVIEW*

■ The Court typically analyzes the fairness of settlements pursuant to Fed.R.Civ.P. 23. This Rule refers only to approval by the

court of class action settlements, which does not technically apply to an EEOC enforcement action. *Binker v. Commonwealth of Pennsylvania,* 977 F.2d 738, 747 (3rd Cir. 1992). I have found no Tenth Circuit case that addresses the standard of review when the settlement is negotiated by the EEOC in its enforcement capacity. At least one federal court has indicated that an EEOC settlement does not need to be approved by the court. *See E.E.O.C. v. Consolidated Edison Co. of New York, Inc.,* 557 F.Supp. 468, 470 (S.D.N.Y.1983). However, the majority of courts do evaluate EEOC settlements for their "fairness, adequacy and reasonableness." *See,* for example, *Binker,* 977 F.2d at 747–48; *E.E.O.C. v. McDonnell Douglas Corp.,* 894 F.Supp. 1329, 1333 (E.D.Mo.1995).

I find that such a fairness review is appropriate in this case because "the settlement affects victims of age discrimination whose rights to intervene are limited once EEOC has initiated suit." *Binker,* 977 F.2d at 748. Further, the Parties have stipulated to such a procedure. Thus, the issue becomes what amount of deference is due the EEOC and what other factors may be relevant to this Court's consideration of an EEOC negotiated settlement.

The EEOC is "charged with the responsibility of investigating, litigating, and, if possible, settling claims on behalf of both the general public and individual victims of discrimination." *Consolidated Edison,* 557 F.Supp. at 473. As that court noted:

> By commencing suit before any of the [persons represented by the EEOC] chose to do so, the EEOC pursuant to ADEA § 7(c)(1) became the sole cognizable plaintiff with regard to the claims it sought to vindicate. As such, the EEOC must be given the broad discretion accorded any plaintiff in the conduct and discontinuance of its suit. The EEOC has been statutorily, and thus conclusively, determined to be an adequate representative of those whose rights it seeks vindication.

5. This number includes the 46 Objectors represented by attorney Kristen Mix, referred to herein as the "Barbezat Objectors." Another pleading filed by the Parties asserts that only 107 individuals filed objections. The Court will rely, for purposes of this Order, on the higher number given by the Parties.

*Id.* at 474 (internal citations omitted). Thus, courts generally give at least some deference to the EEOC's conclusion that the settlement is fair and reasonable. *See McDonnell Douglas,* 894 F.Supp. at 1335; *see also E.E.O.C. v. Pan American World Airways, Inc.,* 622 F.Supp. 633, 639 (N.D.Cal.1985), *app. dismissed,* 796 F.2d 314 (9th Cir.1986), *cert. denied,* 479 U.S. 1030, 107 S.Ct. 874, 93 L.Ed.2d 829 (1987).

■ The pertinent inquiry in evaluating a settlement entered into by the EEOC is the "overall fairness" of the settlement, and "[t]he agreement stands or falls in its entirety." *Binker,* 977 F.2d at 746. Thus, the Court must consider factors "beyond maximizing the potential benefit to an individual claimant." *Binker,* 977 F.2d at 746. As one court held:

> Objections based purely upon individual claims of loss do not warrant disapproval of the proposed settlement.... In assessing the fairness of a settlement, the Court's role is not to make a de novo determination of whether the measures applied to all claimants provide each individual with a satisfactory recovery. Rather, the criteria or methodology employed by the litigants is sufficient if its terms, when applied to the entire group of individuals represented, appear reasonable.

*McDonnell Douglas,* 894 F.Supp. at 1335; *see also E.E.O.C. v. Hiram Walker & Sons, Inc.,* 768 F.2d 884, 889 (7th Cir.1985), *cert. denied,* 478 U.S. 1004, 106 S.Ct. 3293, 92 L.Ed.2d 709 (1986) ("the parties to a settlement will not be heard to complain that the relief is substantially less than what they would have received from a successful resolution after trial"); *cf. Pan American,* 622 F.Supp. at 641–648.[6]

■ In addition to the above factors, courts that have considered settlements entered into by the EEOC generally apply the factors used to assess the reasonableness of class action settlements under Rule 23. I find that such an analysis is relevant to my review of the Consent Decree here. Under Rule 23, approval of a class action settlement

is committed to the sound discretion of the court. *Jones v. Nuclear Pharmacy, Inc.,* 741 F.2d 322, 324 (10th Cir.1984). "In exercising its discretion, the trial court must approve the settlement if it is fair and reasonable." *Id.*

■ The specific factors that must be considered by the court in assessing whether the settlement is fair and reasonable under Rule 23 include the following:

"(1) whether the proposed settlement was fairly and honestly negotiated;

(2) whether serious questions of law and fact exist, placing the ultimate outcome of the litigation in doubt;

(3) whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation; and

(4) the judgment of the parties and their counsel that the settlement is fair and reasonable."

*Id.*

■ As to the third factor, the "value of an immediate recovery" means "the monetary worth of the settlement." *Gottlieb v. Wiles,* 11 F.3d 1004, 1015 (10th Cir.1993). "[T]hat value is to be weighed not against the net worth of the defendant, but against the possibility of some greater relief at a later time, taking into consideration the additional risks and costs that go hand in hand with protracted litigation." *Id.* "The financial condition of the defendant is irrelevant to a determination of the value of the settlement." *Id.*

■ "[T]he primary concern addressed by Rule 23(e) is the protection of class members whose rights may not have been given adequate consideration during the settlement negotiations." *Alvarado Partners, L.P. v. Mehta,* 723 F.Supp. 540, 546 (D.Colo.1989), *app. dismissed,* 936 F.2d 582 (10th Cir.1991). Further, the court must determine whether the agreement is the product of fraud, overreaching or collusion. *McDonnell Douglas,* 894 F.Supp. at 1333; *see also In Re New*

---

**6.** However, this does not preclude "an examination of the fairness of an award to an individual or to a small number within the larger group

affected by a settlement" since in evaluating fairness, these factors are among those which must be considered. *Binker,* 977 F.2d at 748 n. 17.

*Mexico Nat. Gas Antitrust Litig.,* 607 F.Supp. 1491, 1497 (D.Colo.1984). Additional factors which may be relevant include: (1) the risk of establishing damages at trial; (2) the extent of discovery and the current posture of the case; (3) the range of possible settlement; and (4) the reaction of class members to the proposed settlement. *New Mexico Nat. Gas Antitrust Litig.,* 607 F.Supp. at 1504; *Hiram Walker,* 768 F.2d at 889.

█ Importantly, in evaluating the fairness of the settlement, courts are not to decide the merits of the case or resolve unsettled legal questions. *Carson v. American Brands,* Inc., 450 U.S. 79, 88 n. 14, 101 S.Ct. 993, 998 n. 14, 67 L.Ed.2d 59 (1981); *New Mexico Natural Gas Antitrust Litig.,* 607 F.Supp. at 1497. This is because the essence of settlement is compromise, and settlements are generally favored. *Williams v. First Nat. Bank,* 216 U.S. 582, 595, 30 S.Ct. 441, 445, 54 L.Ed. 625 (1910); *Hiram Walker,* 768 F.2d at 889.

## VI. *APPLYING THESE FACTORS TO THE CASE AT HAND*

### A. *Whether the Proposed Settlement Was Fairly and Honestly Negotiated*

█ First and significantly, no Objector even alleges, much less advances, any facts or evidence of fraud, collusion or overreaching in connection with the Consent Decree or the mediation. Further, the Court finds that both parties have vigorously advocated their respective positions throughout the pendency of the case.

In that regard, the EEOC asserts, and the Court so finds, that it devoted serious, continuing and substantial personnel resources to the prosecution of this case. The EEOC expended in excess of 15,000 attorney hours, as well as extensive investigative and litigation support staff time. As many as four (4) attorneys were assigned full-time as the litigation progressed. The EEOC's Denver Regional Attorney personally supervised this team. The Regional Attorney also assigned two paralegal assistants and one legal assistant to this case and hired two contract paralegals. Moreover, the EEOC assigned an Assistant General Counsel from its St. Louis District Office to head up the mediation efforts and to oversee the effective prosecution of the case. In addition, the EEOC assigned two senior staff members from its internal Office of Research and Analytic Services to assist in the review and analysis of data, and employed the services of an Assistant General Counsel from the Office of General Counsel.

MMC asserts, and the Court finds, that it also staffed the case with considerable resources. In addition to MMC's own staff of attorneys, MMC assembled a trial team consisting of experienced trial and employment law attorneys from three Denver law firms. MMC also retained the services of two attorneys with experience in class action employment litigation from a firm with offices in Detroit and Washington, D.C.

The Parties filed countless motions, responses and replies to assorted discovery and substantive issues, indicating to the Court that counsel were engaged in zealous advocacy in support of their respective positions. Parenthetically, due to the number and magnitude of discovery disputes that were pending when this case was transferred to me on September 1, 1995, I withdrew the order of reference to the Magistrate Judge and personally presided over all pending discovery disputes. There were several hearings where I reviewed voluminous documents and made rulings on the applicability of the attorney-client privilege and work product doctrine to those documents. Further, motions to dismiss and motions to force the EEOC to elect between disparate impact and disparate treatment theories of recovery were filed. There were three motions for partial summary judgment, all of which remained pending at the time of the settlement, and a motion for judgment on the pleadings, which the Court granted. The pending motions challenged inclusion in the class of persons who had signed general releases and persons who had volunteered, in writing, for layoff. These motions were vigorously contested by the EEOC. Due to the volume of motions filed and the complexity of the issues on substantive, scheduling and discovery mat-

ters, the Court found it necessary to hold monthly status conferences.

The Court finds that the parties also engaged in voluminous discovery in connection with both the litigation and the mediation process. The litigation discovery consisted of over 60 depositions by the Parties and the EEOC's "omnibus" request that MMC produce documents on a MMAG-wide basis. The Parties also agreed to use a joint data base of computerized personnel information. During the discovery phase of the case the EEOC reviewed several hundred boxes of documents, including policies and procedures, personnel files and management files, consisting of approximately two million pages of documents. The EEOC selected more than 100 boxes of documents for reproduction and further analysis. The EEOC also received and analyzed most of MMAG's Human Resources Data Base, consisting of one gigabyte of data.

During the mediation, further extensive discovery occurred, as described above in Section II. This included the EEOC's review of more than 275 boxes of documents and the taking of depositions by the Parties of more than 60 witnesses. Further, the Parties vigorously presented their respective positions throughout the comprehensive mediation process, which included a mini-trial on the merits of the litigation and submissions by certain of the parties' experts, such as the statisticians and human resources professionals. I find that this mediation was agreed to in good faith and that there was no fraud or collusion involved in the mediation process. The completeness and intensity of the mediation process, coupled with the quality and reputations of the Mediators, demonstrate a commitment by the Parties to a reasoned process for conflict resolution that took into account the strengths and weaknesses of their respective cases and the inherent vagaries of litigation.

For the foregoing reasons, I find that each Party vigorously represented the interests of

its respective constituency throughout the process leading to the proposed Consent Decree that was submitted to the Court on November 18, 1996.

B. *Whether Serious Questions of Law and Fact Exist That Place The Ultimate Outcome of The Litigation In Doubt*

 I find that serious questions of law and fact exist in this case that place the ultimate outcome of the litigation in doubt. It simply is not certain that the EEOC would have prevailed, contrary to what many of the Objectors contend. Indeed, the one constant about litigation, based on my experiences as a trial attorney and now as a judge, is that the ultimate jury result is uncertain, unknown and unpredictable. More fundamentally, my role at this stage of the proceeding is not to evaluate the merits of the litigation, since this would contravene the parties' decision to "waive their right to litigate the issues involved in the case and thus save themselves the time, and the inevitable risk of litigation." *United States v. Armour & Co.*, 402 U.S. 673, 681, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971). I will now highlight the case disputes that place the outcome of this litigation in doubt.

1. *Whether the Layoffs Were Due to Age or to Other Factors. Such As the Downturn in the Defense Industry*

Central to the uncertainty of the litigation's outcome is MMC's contention that the layoffs resulted from a downturn in the defense industry budget and had nothing to do with the age of MMC employees. MMC would likely present trial evidence that with the fall of the Soviet Union and the end of the "Cold War," the budgets of the Defense Department were reduced substantially. Major weapons and space systems were canceled or reduced and extended as a consequence.[7] The EEOC acknowledges that it would be able to introduce no contrary evi-

---

7. For example, MMC asserts that the following contracts were terminated: the small ICBM and Zenith Star programs, the Peacekeeper missile program, the NASA Flight Telerobotic Servicer and SUPER programs, the Super Collider Program and other major classified contracts. Further, MMC asserts that delivery dates for a major classified contract and for Titan IV launch vehicles were extended and there were reductions in and the ultimate termination of the Brilliant Pebbles program.

dence on this issue and would be forced to rely on statistics to prove that age was a factor in approximately 337 to 404 layoffs.

## 2. The Admissibility of Certain Statistical Evidence to Prove a Pattern and Practice of Discrimination

Another critical issue that could have affected the outcome of the litigation concerns the Parties' statistical analyses of the data regarding the composition of the work force. There are fundamental disagreements between the Parties over how these statistics can be used to prove pattern and practice age discrimination. The EEOC contends that, among other ways, a pattern of age discrimination can be proven is through evidence that age was considered by the decision-makers and through the statistical results of all layoffs in the aggregate. Further, the EEOC would contend that statistical evidence showing ages, job assignments and positions of persons who were within the pool of all persons subject to layoff, and who were actually laid off, would be relevant and admissible to its liability case.

MMC disagrees and would present evidence that the decision-makers were diverse, decision-making was decentralized and the affected employees were not all similarly situated. Thus, MMC argues that each decision must be attacked and defended on its own merits, including only statistics disaggregated by the decision-making unit, and that the layoffs have to be dealt with by job group. Further, MMC was prepared to rebut any company-wide statistics offered by the EEOC.

Another disputed issue is whether there was a statistical basis for concluding that some proportion of the employees over age 40 would not have been laid off due to age. In that regard, the Parties agree that the vast majority of employees age 40 and over who were laid off would have been laid off even in the absence of the alleged discrimination. On that point, the EEOC's expert concluded that age was a statistically significant factor in the layoffs of between 337 and 404 persons. MMC's expert disagreed, concluding that there is no statistical basis for such a finding. Further, even if a statistical dispari-

ty existed, an issue remained as to how to determine which particular employees were the ones who should not have been laid off. MMC was prepared to defend each individual selection for layoff. Other statistical issues that were subject to good faith dispute included what factors, other than age, should have been addressed in a statistical model; how voluntary separations, including retirements, affected statistical analysis; and whether statistics could establish disparate treatment, as opposed to disparate impact.

The Parties acknowledge that their respective experts in the fields of statistical analysis were credible, qualified and extremely familiar with the underlying data that was available for analysis in this litigation. The respective experts for each Party found fault with the other's statistical models. It is clear that a fact finder, when confronted with diverging opinions from experts of this caliber, could adopt the approaches used by one expert, or the other; could reject both; or could arrive at a middle ground between the two, accepting portions of the expert opinions but coming to an independent conclusion.

## 3. The Effect of The Decentralized Decision–Making at MMC on The Pattern and Practice Claim

Related to the statistical issues is the issue of whether there can be a pattern or practice of intentional age discrimination if the layoffs resulted from separate decisions by autonomous, lower-level managers. MMC asserts that these decisions were made without specific direction from higher management, affecting subordinates who differed on many factors. MMC argues that supervisors followed general reduction in force guidelines in place within the different companies, but no single directive dictated a uniform method of layoff selection. Instead, the particular needs of the program or central organization to which employees were assigned drove layoffs and the layoffs occurred sporadically from 1990 until mid–1994, as different events took place under various programs and supervisors made decisions in response to unique circumstances. MMC argues that to suggest that hundreds of supervisors, working independently on separate programs im-

pacted by different factors, would somehow simultaneously conclude that layoffs should be based on age defies reason, common sense and ignores the historical facts.[8]

#### 4. The Use of Anecdotal Evidence to Show Age Animus

Another area where significant disputes of law and fact exist concerns alleged age-negative comments or anecdotal evidence. The EEOC asserts that it would have presented evidence of oral and written statements that would show age bias. MMC would have disputed whether many of these statements ever occurred and would also have argued that anecdotal evidence was inadmissible absent a connection to a specific employment decision.

#### 5. Issues Regarding Damages

Finally, the Parties contend, and the Court finds, that there would have been significant trial differences about the amount of damages that employees could have received even if MMC was found liable. Courts do not require employers to pay for all damages an employee may claim to have suffered, such that the employee would get a windfall. Instead, the employee has the duty to mitigate damages by showing that he or she actively sought equivalent positions. Clarke v. Frank, 960 F.2d 1146, 1152 (2nd Cir.1992); Sprogis v. United Air Lines, Inc., 517 F.2d 387, 392 (7th Cir.1975). MMC asserts that it would have presented evidence that many class members did not mitigate their damages as the law requires.

■■■ Further, there are issues regarding front pay and back pay. A back pay award must be offset by actual interim earnings. Horn v. Duke Homes, Div. of Windsor Mobile Homes, 755 F.2d 599, 606–07 (7th Cir.1985). Front pay would also probably not be awarded for a lifetime; instead, front pay is to provide a financial cushion for a reasonable period during which a diligent claimant could secure reemployment. Loeb v. Textron, Inc., 600 F.2d 1003, 1023 (1st Cir.1979). Finally, the Court would have to consider tailoring the award to the actual number of alleged discriminatory layoffs, in this case between 337 to 404 according to the EEOC, not to the total number of class members. See Ingram v. Madison Square Garden, 709 F.2d 807, 812 (2nd Cir.), cert. denied, 464 U.S. 937, 104 S.Ct. 346, 78 L.Ed.2d 313 (1983).

#### C. Whether The Value of An Immediate Recovery Outweighs The Mere Possibility of Future Relief After Protracted and Expensive Litigation

■■■ Pattern and practice class action employment discrimination lawsuits have a well-deserved reputation of being complex. Cotton v. Hinton, 559 F.2d 1326, 1331 (5th Cir. 1977). I find that this case is complex as evidenced by the volume and complexity of pleadings that have been filed with the Court and the number of significant issues of fact and law that exist. Further, this controversy, including the initial investigation by the EEOC and the subsequent litigation, is over six (6) years old already. Absent settlement, and notwithstanding this Court's considerable efforts to move this action along, there is no clear end in sight.

Certainly, this Court cannot conclude that the case would end upon completion of the trial. Trial is set to begin on October 6, 1997, and the Parties estimate several months of trial time for the initial liability phase, which estimate I find reasonable. In the event MMC prevailed on the pattern or practice issue and the EEOC did not appeal, the Claimants would recover nothing. If the fact finder were to conclude that the EEOC established a pattern or practice discrimination, MMC would probably appeal that decision. An appeal, in turn, could lead to remand proceedings, a possible new trial, and further appeals. Finally, decisions on the dispositive motions discussed under Section VI(A) above could have generated separate appealable issues.

The lack of U.S. Supreme Court precedent dealing with pattern or practice theory under

---

8. See, for example, Sperling v. Hoffmann–La Roche, Inc., 924 F.Supp. 1346, 1363 (D.N.J.1996) ("[A] decision by a company to give managers the discretion to make employment decisions, and the subsequent exercise of that discretion by some managers in a discriminatory manner, is not tantamount to a systematic, company-wide policy of intentional discrimination").

the ADEA suggests that many issues, in a case of this magnitude, ultimately would have been resolved by an appellate court. In short, absent a case settlement, a final result could be five to ten years away. The Ninth Circuit's discussion in *Officers for Justice v. Civil Service Commission*, 688 F.2d 615 (9th Cir.1982), *cert. denied*, 459 U.S. 1217, 103 S.Ct. 1219, 75 L.Ed.2d 456 (1983), supports my conclusion:

> The track record for large class action employment discrimination cases demonstrates that many years may be consumed by trial(s) and appeal(s) before the dust finally settles.... This case is exemplary. After six years, trial of only the race discrimination issues had finally begun with the testimony of a single witness.

*Id.* at 629 (internal citation omitted).

Even in the absence of any appeal, and assuming the EEOC prevailed in the liability phase, individual hearings would then need to be held as to the claim of each potentially aggrieved individual. In those hearings, MMC would seek to introduce extensive, individualized rebuttal evidence as to each individual, including testimony from supervisors, most of whom were in the protected age group themselves, explaining the age-neutral bases for the layoff decisions. This would require the EEOC and the potentially aggrieved individuals to discover and present contrary evidence in support of their claims. These individual proceedings would be a monumental task on behalf of both the Court and the Parties, since there are about 2,000 potentially aggrieved persons. Assuming, conservatively, that each Claimant's hearing required a half day of preparation time and a half day at the hearing, these proceedings would consume at least 2,000 days of attorney and Court time.

It is obvious from the foregoing that the cost of further litigation would be prohibitive, and would match the anticipated length and complexity of this massive litigation. The Supreme Court has held "the interest in avoiding the additional expenditures associated with continuing the litigation may ... justify accepting an otherwise doubtful settlement." *Evans v. Jeff D.*, 475 U.S. 717, 743

n. 36, 106 S.Ct. 1531, 1545 n. 36, 89 L.Ed.2d 747 (1986).

In light of the likelihood of protracted litigation, the ages of many class members also weigh heavily in favor of immediate recovery. Layoffs began in 1990. Approximately 49 percent of the class were 55 years of age or older when laid off. After a pattern or practice trial, individual liability and damages trials and appeals, followed by possible retrials, awards, if any, would be delayed until the next century. I find that the monetary provisions of the Consent Decree are more valuable if implemented now than if victims must wait an additional number of years. Several Claimants have already died. As the Ninth Circuit has held, failure to approve a settlement of this size and complexity essentially will mean "[d]uring the remainder of the litigation, and probably an appeal, many of the immediate and tangible benefits accruing from the settlement would be lost." *Officers for Justice*, 688 F.2d at 629.

For all of the foregoing reasons, I find that the value of an immediate recovery through the Consent Decree outweighs the mere possibility of future relief, following protracted and expensive litigation.

D. *The Judgment of The Parties and Their Counsel That The Settlement Is Fair and Reasonable*

It is undisputed that the attorneys representing both the EEOC and MMC support and recommend the approval of the settlement. The attorneys for the EEOC who endorse the settlement include its General Counsel, Deputy General Counsel, Associate General Counsel, Acting Assistant General Counsel and other attorneys of its Office of General Counsel in Washington, D.C. The settlement was also approved by the Denver District Regional Attorney and one Senior Trial Attorney assigned to the Denver District Office.

Given the primary enforcement power of the EEOC under the ADEA and the EEOC's duty to further the public interest, I find that I must give some deference to the EEOC's acceptance of the Consent Decree. This deference is consistent with those court decisions that have held that the recommendation of a settlement by experienced plaintiffs

counsel is entitled to great weight. *See Cotton*, 559 F.2d at 1330; *Luevano v. Campbell*, 93 F.R.D. 68, 88 (D.D.C.1981). Indeed, "[c]ourts have consistently refused to substitute their business judgment for that of counsel and the parties." *Alvarado*, 723 F.Supp. at 548.

Deference is particularly appropriate here since an EEOC enforcement action simply does not raise the same concerns as private class actions. Those actions require courts to exercise special scrutiny due to three potentially conflicting economic interests: class counsel, who want fees; named plaintiffs, who want a greater share of the settlement; and unnamed class members who must be compensated for extinguishment of their rights. In an EEOC action, no portion of the settlement fund goes to the EEOC, whose sole objective is furtherance of the public interest. No attorneys' fees will be paid to the EEOC, and the EEOC will not even be offsetting the settlement fund to recoup its costs.

With respect to the approval of the Claimants, it is undisputed that the vast majority of the Claimants who submitted claim forms to participate in the settlement do not object to the Consent Decree. Of the 1,777 Eligible Claimants that submitted claim forms, 1,663 indicated that they did not want to object to the Consent Decree and only 114, or 6.4 per cent of the Claimants, objected. Certainly, in a large class action case it is to be expected that at least some class members will object. Further, many courts conclude that a settlement can be fair even despite a large number of objections. *TBK Partners, Ltd. v. Western Union Corp.*, 675 F.2d 456, 462 (2nd Cir.1982); *Cotton*, 559 F.2d at 1331; *Reed v. General Motors*, 703 F.2d 170, 174 (5th Cir. 1983); *Hiram Walker*, 768 F.2d at 890–92; *Pan American*, 622 F.Supp. at 641; *McDonnell Douglas*, 894 F.Supp. at 1335.[9]

### E. Consideration of Other Factors

1. *The Protection of Class Members Whose Rights May Not Have Been Given Adequate Consideration During the Settlement Negotiations.*

As stated above, this factor is a key consideration for the Court. *Alvarado*, 723

F.Supp. at 546. I find that the EEOC adequately protected the rights of all Claimants, and that there is no evidence that certain Claimants' rights may not have been given adequate consideration during the settlement. I address this issue in more detail below in Section IX(D) in connection with specific objections to the distribution formula.

### 2. The Risk of Establishing Damages at Trial

For the same reasons discussed in Section VI(B)(5) above, I find that there is a significant risk of establishing damages at trial. Therefore, this factor supports my decision to approve the Consent Decree.

### 3. The Extent of Discovery and The Current Posture of The Case

As discussed in Sections I, II and VI(A) above, this case has been in litigation for years. Significant discovery has occurred and the parties have filed countless dispositive and nondispositive motions and legal briefs. While in some cases class actions are settled before trial and the court possesses limited information to assess the settlement, just the opposite situation exists in this case. Here, extensive discovery has been completed by the parties, including depositions; the EEOC has reviewed millions of pages of documents; the Parties used expert witnesses to review and analyze statistical information, documents and testimony regarding MMC's personnel practices and policies; and the Court has reviewed some of the comprehensive discovery in connection with discovery disputes. These factors support the conclusion that the settlement was the result of an informed and carefully considered decision by the Parties.

### 4. The Range of Possible Settlement

If approved, the proposed settlement will provide immediate monetary benefits totaling thirteen million dollars ($13,-000,000) to the aggrieved individuals. In

---

**9.** I address the merits of the individual objections in Section VII below.

addition, the Consent Decree provides employment to 450 persons at salaries which are estimated to average in excess of $76,000 per year for each rehired person. This process will provide more than an estimated thirty-four million dollars ($34,000,000) per year in compensation to those class members rehired because of the EEOC's lawsuit and the settlement's terms. Over the life of the Consent Decree, this translates into more than an estimated one hundred and seventy million dollars ($170,000,000) in real earnings to the Eligible Claimants.

The extent of relief that could be recovered if the case were successfully litigated to a conclusion cannot be determined with any degree of certainty. What is certain is that continued protracted litigation would delay for many years relief for those persons who will receive immediate benefits under the terms and conditions of the Consent Decree. As discussed above in Section VI(B), the EEOC and those for whom it seeks relief face obvious risks in litigating what undoubtedly would be a vigorously contested case with many uncertainties as to the ultimate outcome.

Given the risks inherent in proceeding with this litigation, the EEOC asserts, and I find, that it is prudent to accept a settlement that provides eligible Claimants both a substantial monetary recovery and significant employment benefits now. *See Oppenlander v. Standard Oil Co.*, 64 F.R.D. 597, 624 (D.Colo.1974), where the court observed:

> [T]he court should consider the vagaries of litigation and compare the significance of immediate recovery by way of compromise to the mere possibility of relief in the future, after protracted and expensive litigation. In this respect, it has been held proper to take the bird in hand instead of a prospective flock in the bush.

*Id.* at 624 (quotation omitted); *see also Officers for Justice*, 688 F.2d at 629 (failure by the court to accept the settlement could mean that "many of the immediate and tangible benefits accruing from the settlement would be lost").

## VII. ANALYSIS OF THE OBJECTIONS IN THIS CASE

### A. Insufficient Monetary Compensation

 The vast majority of objections to the Consent Decree concern the monetary amount of the settlement. The Objectors claim that the settlement amount does not adequately compensate for their damages incurred as a result of MMC's wrongful conduct, including actual losses, emotional distress, loss of retirement benefits and rights in a pension and profit sharing plan, loss of medical insurance and/or the fact that many of the Claimants cannot find reemployment. Many of the Objectors refer to the settlement as a "mere pittance," "a slap on the wrist" of MMC, or as "insulting."

 In addressing these objections, I first note that the fact that "a cash settlement amounts to only a fraction of the potential recovery will not per se render the settlement amount unreasonable," particularly where there is other relief in the settlement that the claimants will benefit from. *Officers for Justice*, 688 F.2d at 628; *see also United States v. Allegheny–Ludlum Industries, Inc.*, 517 F.2d 826, 864 (5th Cir.1975), *cert. denied*, 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976) (settlement upheld; objectors did not make a "compelling showing" that average of $500 award was "nothing but a mere pittance"); *Hiram Walker*, 768 F.2d at 891 ("[t]here is no showing that the amounts received by the beneficiaries of the settlement were totally inadequate"). The Consent Decree in this case does provide for significant benefits in addition to the monetary payment, including the rehiring provision whereby MMC is required to rehire 450 of the claimants. "It is the complete package taken as a whole, rather than the individual components, that must be examined for overall fairness." *Officers for Justice*, 688 F.2d at 628.

 More importantly, the Objectors consistently fail to recognize that the $13 million payment under the Consent Decree cannot be evaluated based on what each Claimant might recover if he or she prevailed on the full amount of each alleged claim. There are three critical reasons for this.

First, as discussed above, fairness is not driven by whether each individual receives a satisfactory recovery, and "objections based purely upon individual claims of loss do not warrant disapproval of the proposed settlement." *McDonnell Douglas,* 894 F.Supp. at 1335; *EEOC v. Com. of Pa.,* 772 F.Supp. 217, 220 (M.D.Pa.1991), *aff'd,* 977 F.2d 738 (3rd Cir.1992). Indeed, the Court is not required to engage in a de novo determination of whether the settlement provides each individual claimant with a satisfactory recovery, and the mere possibility that greater relief could be obtained if the case were tried is not a valid reason to object to the settlement. *McDonnell Douglas,* 894 F.Supp. at 1335; *Com. of Pa.,* 772 F.Supp. at 220–21. Rather, the pertinent issue is whether the settlement applied to the group as a whole is reasonable. *Id.*

Second, the individual Objectors fail to recognize that any potential recovery, whether individual or collective, must be discounted to reflect the potential for a defense verdict. The $13 million settlement negotiated by the Parties clearly must represent some middle ground on the disputed issues. MMC vigorously disputed the amount of damages claimed by the EEOC when the case was originally filed. If MMC prevailed at the pattern or practice stage, Claimants would have no further rights and would recover nothing because they neither filed charges nor opted into private actions. Even if the EEOC prevailed at this stage, Claimants would still face the risk that, in individual trials, MMC could overcome the presumption arising from the pattern or practice verdict on the particular facts of their layoffs or would substantially reduce their damages under a failure to mitigate theory.[10]

Third and very important to this Court's analysis, the EEOC's statistical model never suggested that *all* layoffs in the protected age group were discriminatory. To the contrary, the EEOC contended that between 337 and 404 "excess" layoffs occurred, i.e., layoffs that would not have occurred if age was not a factor. The recovery is thus not designed to alleviate discriminatory effects for the over 2000 class members; instead, the recovery amount must be viewed in the context of the "excess" layoffs due to age. If the $13 million is divided between the 404 individuals (at most) whom the EEOC's statistical model shows may have actually suffered age discrimination, the settlement nets over $32,178 per person (not including the additional $10,000 to $15,000 to be paid to those individuals who actually filed charges with the EEOC). This amount is certainly not a "pittance."

The fact that the full amount must be distributed among the 1,777 people who claim entitlement to it, rather than to the probable actual victims of discrimination, is simply a fact of life in pattern and practice cases. Had each one of the 1,777 people filed his or her own action, it is likely that some would have won and some lost, and each would have had to pay attorney's fees and costs.

A couple of the Objectors argue that the Court should consider the financial viability of MMC in considering the fairness of the settlement. For example, the Barbezat Objectors, citing *Alvarado,* argue that MMC's parent company is a $30 billion giant in defense with soaring profitability. First, I note that the court in *Alvarado* simply noted that the defendant was financially viable at the time of settlement but that there was a potential for bankruptcy if the litigation continued. *Id.,* 723 F.Supp. at 547. This is not an issue in this case because no threat of bankruptcy has been raised. Second, the Tenth Circuit has never required a district court to consider financial condition of the defendant as a factor in evaluating a settlement, holding that the financial condition is irrelevant to a determination of the value of the settlement. *Gottlieb,* 11 F.3d at 1015.

Finally, some of the Objectors assert that the settlement amount does not sufficiently penalize MMC for its willful violation of the ADEA. The Objectors miss the point of the settlement process. Settlement is about compromise, and necessarily involves giving up some rights to "save the [parties] the time, and the inevitable risk of litigation."

---

10. Indeed, many factors in addition to efforts made to mitigate losses affect the calculation of back pay and front pay in a class action: subsequent layoffs, subsequent voluntary retirements and resignations, interim earnings and the availability of comparable employment.

*Armour,* 402 U.S. at 681, 91 S.Ct. at 1757. Since the case has not gone to trial and the evidence has not been presented, it is not appropriate for the Court to conclude, and there is no basis for it to determine, that MMC violated the ADEA or engaged in other sanctionable conduct. MMC vigorously disputes that any age discrimination occurred and, as discussed above in Section VI(B), the ultimate outcome of the litigation is in doubt due to a number of serious disputed issues of fact and law. The only appropriate issue for the Court, and the one it is considering, is the fairness of the settlement.

My review of the overall fairness of the settlement leads me to conclude that the monetary portion of the settlement is fair and reasonable and the objections as to the amount are without merit. It is true that under the Consent Decree some Claimants may get less than their "best case" scenario. However, many other Claimants-i.e. the 1,500 or more former employees beyond the EEOC's calculation of "excess" layoffs—will receive much more than they would have received if this case had gone to trial. Moreover, the reasonableness of the monetary settlement is supported by the additional non-monetary provisions of the settlement.

B. *Inadequate Or Illusory Non–Monetary Benefits*

■ Many Claimants also object to the non-monetary benefits of the settlement. With respect to the rehiring provision, for example, the Objectors assert that the dollar value associated with the rehiring is uncertain and could be extremely low, especially since MMC will profit from the work done by the Claimants and since MMC has full discretion to lay them off in the future at any time. Further, some Objectors assert that the rehiring component has unfairly allowed MMC and the EEOC to publicly exaggerate the value of the settlement, estimating it at approximately $200 million, and that the rehire provision is simply not worth the amount the Parties claim. Further, some Objectors assert that MMC has promised to rehire a mere 12% of the Claimants, thus benefitting only 12% of the Claimants, and that all of the Claimants should be eligible for rehiring if

they so wish or should be paid in lieu of rehiring. A number of the Objectors also contends that the rehiring provision is unfair because it does not call for equivalent jobs or compensation and because it requires the rehires to be considered along with all of the other applicants. Finally, some Claimants object to the limitation of the rehiring provision to the Denver metropolitan area.

Other objections are aimed at the outplacement services offered through MMC's Career Center and the classes offered at MMC's Evening Institute. Objectors assert that the value of these services is worthless, speculative, dubious or is substantially inflated. Further, there are objections that both services are at MMC's pleasure, that they provide no value to those people who are located out of state, and that they are useless because no one will hire older employees. Objections to the Career Center are that it is useless, many employees already have access to this service or have used the service with no results, and/or that the Career Center is not effective in finding jobs for employees over 40. Objections to the Evening Institute are that it is not accredited and the courses are not taught by qualified instructors, the courses do not provide a basis of qualification for new employment, there are too few classes offered, and/or the classes are geared to subject matter applicable only to MMC.

The EEOC maintains that the rehiring requirements, Evening Institute and Career Center do have value and are designed to serve to advance a significant purpose of the ADEA; namely, the employment of older persons by assisting Eligible Claimants in obtaining employment either with MMC or other employers. I agree. I find that the rehiring requirement fulfills the statutory purpose of the ADEA by providing jobs directly and the Career Center and Evening Institute will help others to reenter or advance in the general labor market. The ADEA and Title VII exist to enhance employment, not to redistribute money. Cases interpreting the ADEA strongly favor reinstatement over prospective monetary relief. *James v. Sears, Roebuck and Co., Inc.,* 21 F.3d 989, 997 (10th Cir.1994).

With respect to the rehiring provision, the Parties assert, and I agree, that the 450 jobs to be provided to Eligible Claimants are a substantial benefit to former employees. The Parties stipulate that the average salary of the jobs into which the first 204 rehired EEOC class members were hired is $76,000.00, including benefits. The Parties also agree that the 450 jobs contemplated by the Consent Decree will provide an estimated $34 million each year to Claimants who are rehired, and that over the five year term of the proposed Consent Decree, Claimants will earn an estimated $170 million in pay and benefits.

Further, the rehiring requirement virtually eliminates front pay as a factor in negotiations, at least for a large number of the Claimants. This is because, upon achievement of the rehire obligation, the EEOC's *highest* statistical estimate of "excess," i.e. allegedly discriminatory, layoffs (numbering 404 layoffs) will have been neutralized since 450 people will have been rehired. If one considers the more conservative statistical finding that only 337 employees were laid off due to age, the rehire provision provides employment to 114 more persons than the EEOC's statistical model supported.

With respect to the Career Center, it is ordinarily offered to laid off employees for a period of only six months. The Parties assert, and I agree, that the Center is valuable as evidenced by the fact that its services have been utilized by 3,717 employees from 1990–1994 and that it had a success rate in excess of 70% in placements of the employees who fully participated. Further, the Center currently has access to over 10,000 job openings. With respect to the Evening Institute, the Parties assert, and I agree, that the courses are of assistance in advancing skills of persons either presently employed or in helping bring someone current who has been out of the employment market for an extended period. I find that to a person who desires reemployment, professional career counseling, plus courses that will update critical technical skills, as offered by the Career Center and the Evening Institute, have enormous value.

The objections as to these non-monetary provisions also fail to take into account that the Claimants showed substantial positive responses to these provisions. Interest in rehiring was expressed by the receipt of approximately 645 resumes. In addition, 528 of the Eligible Claimants submitted requests for participation in the Career Center and 680 Claimants indicated an interest in the offer of participation in the Evening Institute. Objectors who deride the value of the Career Center and the Evening Institute ignore the enormous practical value of these benefits.

The EEOC also asserts, and I agree, that the provisions in the Decree regarding monitoring of future reductions in force and training for supervisors and managers are of significant value to the public interest in protecting against any possible future age discrimination, and in educating decision-makers about requirements of the ADEA. Such programs satisfy the statutory purposes of helping employers and workers find ways of meeting problems arising from the impact of age on employment.

For all of the reasons above, I find that the non-monetary provisions of the Consent Decree, including the rehiring provision, the Evening Institute and the Career Center, have value and further the purpose of the ADEA. I further find that the objections on this ground do not merit a conclusion by me that the settlement is unfair.

### C. *Adequacy of EEOC Representation*

The third category of objections deals with the adequacy of the EEOC's representation in this case. Objectors Richard Bosma and Theodore Zen assert management failure and attack alleged decisions by the EEOC not to commit resources to this litigation. Other Objectors argue that the EEOC did not act zealously in representing them in settling for a small fraction of the value of damages and/or in not researching this case as thoroughly as other cases. Related to the above objections is the allegation by some Objectors that the EEOC may have had a conflict of interest or sold out to MMC because of the fact that both the EEOC and MMC are employed by the government, that

is, that the EEOC may have settled for less than it should have to save the government money since MMC, as a government contractor, would ultimately pass the cost on to the government. I find no merit to these objections.

These objections choose to disregard—or are not aware of—the intensity with which the EEOC prosecuted this case. As I previously found in Section VI(A) above, the EEOC vigorously prosecuted and devoted substantial resources to this case. This includes over 10,000 attorney hours, excluding investigative and litigation support staff time, the review of approximately one million pages of documents plus an entire computer data base; extensive motion work; and the participation in or taking of hundreds of depositions. Accordingly, arguments that the EEOC did not commit sufficient resources to this case or that it failed to act zealously in representing its clients are without merit. Further, any allegation of a conflict of interest is not supported by any evidence whatsoever or by the record of this case.[11]

Another group of Objectors asserts that the EEOC represented them without their authorization or object to the fact that the individual Claimants lost the right to opt out of the settlement. Additionally, some Objectors assert that the EEOC failed to satisfy minimum standards of consultation, communication or diligence in connection with its representation of the Claimants throughout the pendency of the litigation or through the mediation. The Objectors complain, in that regard, that they received no request from the EEOC for specific information about their individual situation, including damages, and that they were not advised of the settlement.

■ These objections misconstrue the EEOC's congressionally mandated role in the enforcement of the ADEA. The EEOC does not function as a private attorney who is required to gather information from his or her clients and to confer with them regarding the litigation and potential settlement. Instead, the EEOC has dual roles, to represent the public interest as well as to represent the individual interests of those on whose behalf suit was brought. *See Consolidated Edison,* 557 F.Supp. at 473. To that end, the ADEA makes the EEOC the "sole cognizable plaintiff with regard to the claims it sought to vindicate" and forecloses all private lawsuits once the EEOC has filed suit, as Judge Sparr has previously ruled. *Wilkerson v. Martin Marietta Corp.,* 875 F.Supp. 1456 (D.Colo.1995); *Consolidated Edison,* 557 F.Supp. at 471–74. Thus, these objections are also without merit.

### D. *Fairness of The Distribution Formula*

■ The final category of objections relates to the fairness of the distribution formula. Mr. Bosma, Mr. Zen and a couple of other Claimants object that only a portion of the Claimants will be rehired or will use the Evening Institute and Career Center, and that the majority of the Claimants will receive only token payments. As discussed previously in Section VI(B), I find that the rehiring and other non-monetary provisions are reasonable and are designed to further the purpose of the ADEA and Title VII by enhancing employment opportunities. The fact that these provisions are or may be applicable to only a portion of the Claimants does not make them unreasonable, particularly given the fact that (1) the EEOC's statistical data showed that only a portion the Claimants may have been terminated due to age (between 337 and 404 individuals), and (2) monetary compensation is to be paid to all the Eligible Claimants. Thus, each Claimant will be compensated in some way for the

---

11. At this point I feel I must address Mark Brennan's statements at the Fairness Hearing where he attacked the settlement as a fraud on the Court. At the hearing, the Court gave Mr. Brennan five (5) days in which to file a statement under seal with the Court whereby he could address his allegations. Mr. Brennan did not timely file his statement and did not seek written leave of the Court for an extension of time to file the statement. Accordingly, the statement was stricken by the Court. However, I note for the record that I carefully reviewed the statement before striking it and found nothing therein to substantiate Mr. Brennan's allegation at the hearing that the settlement constituted a fraud on the Court or anything else that might warrant a finding that the settlement was unfair, inadequate or unreasonable.

claimed age discrimination at issue in this suit.

■ Other Claimants object to the criteria used by the EEOC to determine the range of payment amounts. Some Claimants object to labor grades 50 and CP receiving less in compensation than the lower grades of 45 through 49. These Claimants assert that this distribution penalizes those with the most tenure in the company and, accordingly, the most to lose. Other Claimants objected to the fact that the salary grade divisions did not take into account individuals that found themselves in-between age brackets, such as people who were very close in age to 55, while others objected that those Claimants over age 55 would receive 60% more in benefits than those under age 55. Additional criteria were suggested by a number of Claimants, including tenure, unpaid overtime hours, and/or business trips on personal time.

According to the EEOC, the primary reason it chose the three factors of age, labor grade and the number of years that have elapsed since termination was that each is an objective fact, not subject to interpretation. The distribution-factor of age was chosen because the EEOC's statistical evidence showed that persons age 55 and above were more likely to be laid off than those age 54 and below. The analysis also showed that persons age 40 to 54 were more likely to be laid off than those younger than 40, but not as likely as persons age 55 and over. Thus the EEOC distributed settlement proceeds on the basis of age in order to compensate those who were more likely to have been terminated because of age.

On the factor of labor grade groupings, the EEOC asserts that its statistical analyses showed that persons in labor grade groupings 45 to 49 were the hardest hit by layoffs, while those in grade groupings 40–44, 20–39 and 70–76, and 50 and CP were targeted in descending order. Thus, the distribution formulas recognized the largest number of potential victims were in labor grades 45–49, and the fewest in labor grades 50 and CP, and weighted distribution accordingly. Year of termination was used as a distribution factor since a person who left MMC in an earlier year lost more in pay and benefits than one who left in a later year. Distribution was thus weighted more heavily in favor of those who were laid off in the earlier years.

I find that the factors utilized-age at layoff, salary grade and company seniority-rationally and objectively relate to the economic loss at issue. A formula that required evaluation of individual circumstances of several thousand layoffs would interminably delay and defeat the prompt distribution of benefits. Moreover, a formula using subjective factors could result in hundreds more people being excluded from receiving any portion of the settlement.

■ Finally, there were objections regarding the $10,000 to $15,000 additional payment to those who filed timely charges of discrimination with the EEOC. Some Objectors assert that this is unfair since they were misled by either MMC or the EEOC as to whether discrimination was occurring or whether they should file a charge. Other Objectors assert that the persons who filed charges should be paid even more because of the substantial risk they took in coming forward.

I find that the additional payment to charging parties is justified. The courts have consistently approved settlements which provide greater relief to individuals who filed timely claims than to those who did not. *See, e.g., Holden v. Burlington Northern, Inc.,* 665 F.Supp. 1398 (D.Minn.1987); *Luevano,* 93 F.R.D. at 89–90. Without the filing of numerous timely charges, the EEOC would not have initiated its class-wide investigation and this settlement, which provides relief for persons who failed to file a timely charge or any charge at all, would not have been possible. Moreover, all the Timely Charging Parties abstained from filing a private law suit, and will be required to execute a general release to MMC. Under these circumstances, the difference in treatment between Timely Charging Parties and other Claimants is extremely fair, reasonable and justified. Moreover, as to those objections that the Charging Parties should have been paid more, I find that the amount to be paid is reasonable and these Objectors have pro-

vided no valid reason why they should be paid an additional amount.

### E. *Miscellaneous Objections*

#### 1. *Violation of Constitutional Rights*

A few Objectors contend that the Consent Decree violates their constitutional rights. For example, Objector Henry Gertzman claims that he was denied due process because he was forced to sign a form and a release without being able to review a full copy of the Consent Decree or know exactly how much money he'll receive or who will determine this. Contrary to his assertions, the notice provided to Claimants adequately identified the substantive terms of the Consent Decree and also adequately identified a range within which the payment would be made.

■ Mr. Bosma and Mr. Zen claim that their due process rights were violated because they did not timely receive a right to sue notice by the EEOC which either takes them out of the class or gives them a basis for opting out of the class. Such contentions were also raised in support of the Motion to allow Opt–In by the McReynolds Plaintiffs, Richard Gonzales, Ron Sellers and Eddie Wong ("the McReynolds Plaintiffs"), which motion was denied by the Court on February 19, 1997. I find that these arguments are also without merit.

As this Court recognized in denying the McReynolds Plaintiffs' motion, 29 U.S.C. § 626(c)(1) does not allow Claimants to "opt-out" after an EEOC enforcement action has been commenced, and does not require the EEOC to issue notice prior to filing suit. *Consolidated Edison,* 557 F.Supp. at 471–73. Mr. Zen's contentions are particularly without merit given the fact that he never filed a charge with the EEOC and thus failed to preserve an independent right of action. *Adams v. Burlington Northern R. Co.,* 838 F.Supp. 1461, 1467–68 (D.Kan.1993). Mr.

Bosma did file a timely age discrimination charge with the EEOC. However, the EEOC was not required to issue him a notice of right to sue. Under the ADEA, he could have filed suit at any time 60 days after filing his charge, since a notice of right to sue is not a prerequisite to a private suit. 29 U.S.C. § 626(d); *see also Simon v. Manufacturers Hanover Trust Co.,* 849 F.Supp. 880, 884–85 (S.D.N.Y.1994); *Adams,* 838 F.Supp. at 1468.[12]

#### 2. *Comparison of This Settlement to Other Settlements*

A number of Objectors ask the Court to compare this settlement to the Private Plaintiffs' settlement or to other settlements such as the Texaco settlement. As to settlements in other cases, including the Texaco settlement, the Court simply does not have a basis for comparison since the Court does not know the details of that case. There could have been any one of a number of factors that influenced the settlement reached in that case and the Court can not speculate as to whether or how that settlement may be comparable to this settlement.

■ As to the settlement by the Private Plaintiffs, the Court notes that the details of that settlement are confidential and the Court is not privy to its terms. Assuming that the Objectors are correct that the newspaper reports accurately reflect the amount of the settlement,[13] I do not find that the settlement by the Private Plaintiffs supports a finding that the Consent Decree is unfair or inadequate. The published report did not take into account several factors that must be considered in assessing the actual value of the Private Plaintiffs' settlement.

First, the Private Plaintiffs are individuals who filed charges and actively participated in prosecution of their case. These individuals were also required to help fund the private action by contributing money from their pockets at various stages of the case, which

---

12. In addition, on May 6, 1994, the EEOC notified Mr. Bosma and his attorney in writing that conciliation had failed and that the EEOC intended to sue MMC and, thereafter, they requested a copy of the EEOC's Complaint. Having been represented by counsel from the onset, Mr.

Bosma is in no position to claim lack of notice or ignorance of the law.

13. One published report estimated that those plaintiffs will each receive approximately $55,-000.

amounts offset their individual awards. Second, the published reports of the settlement also entirely failed to consider the Private Plaintiffs' liability for attorneys' fees. In contrast, the Claimants represented by the EEOC did not incur costs or attorneys' fees as a result of the EEOC's prosecution of this action. Moreover, the vast majority did not actively participate in the action. Thus, unlike the Private Plaintiffs, the Claimants herein did not incur attorneys' fees, costs or risks and the inconvenience incurred by the Private Plaintiffs. Finally, as previously discussed, the EEOC's statistical data showed that age could have been a factor in the termination of only between 337 to 404 individuals. If the EEOC's settlement is evaluated in the context of this context, the settlement amount per individual is much higher and is more analogous to the Private Plaintiffs' purported settlement.

### 3. Objections That The Monetary Award Is Subject to Taxation

■ A careful reading of the Consent Decree reveals that it takes no position as to what, if any, portion of the monetary relief is subject to federal income tax or to FICA deductions. Nevertheless, the Parties state that it is the position of the Internal Revenue Service that the entire amount of the monetary remedy is subject to federal income tax and that the applicable regulations and case law also supports FICA withholding on the back pay award. Given this, I find that the withholding of taxes by MMC is reasonable. Obviously, as the Parties point out, if an individual Claimant disagrees with the IRS's interpretation of the tax laws, he or she is free to contest the position by filing a claim for a refund of the withholdings.

### 4. Objections to Exclusion from the Class and/or Objections That The Relief Should Not Have Been Limited to Colorado

■ Several objections were filed regarding Objectors' exclusion from the class, either on the basis that their termination occurred outside the class period or because the EEOC concluded that they left the employment of MMC voluntarily. Other Claimants object to the limitation of the Consent Decree to Colorado. I find that the Consent Decree properly reflects the scope of the EEOC's investigation, conciliation efforts and the Amended Complaint. The EEOC has sole discretion to determine the scope of its investigation of possible violations of the ADEA. *See* 29 U.S.C. § 626(a) and (b). This is not subject to review by the Court. *Id.*

### 5. Alleged Continuing Discrimination by MMC

■ Finally, some Objectors contend that the settlement should be rejected or should be reevaluated based on the fact that MMC may be continuing to discriminate against persons on the basis of age in connection with its rehiring practices. This issue is simply not before the Court, since the settlement covers only the class period of 1990 through 1994. If the Claimants who raise this objection believe they are the subject of discrimination by MMC, the appropriate course of action for them to take is to file a charge with the EEOC and have the EEOC investigate the claim.

## VIII. CONCLUSION

After a detailed review and consideration of the terms of the Consent Decree, the objections filed thereto, and the factors to be considered by the Court in approving the fairness of such a settlement, I conclude that the proposed Consent Decree entered into between the EEOC and MMC is fair, reasonable and adequate. Accordingly, it is

ORDERED that the Consent Decree is APPROVED. It is

FURTHER ORDERED that the Parties, within 10 days, shall file a Stipulation for Dismissal With Prejudice and form of Order regarding all claims and causes of action that should be dismissed based on the Court's approval of the Consent Decree.